In re DAN–VER ENTERPRISES, INC., Debtor.

EQUIBANK, Plaintiff,

v.

DAN–VER ENTERPRISES, INC., R. Hardin, Inc., Frank Bilotta, Elizabeth Bilotta, Gloria Veraldi, Louis Sapp and Evelyn Sapp, Defendants.

Bankruptcy No. 79–887.
Adv. No. 86–97.

United States Bankruptcy Court, W.D. Pennsylvania.

April 26, 1988.

On Motion for Reconsideration
May 18, 1988.

Michael J. Henny, Ravick, Henny & Wepfer, Paul M. Daniels, Daniels & Daniels, Pittsburgh, Pa., for debtor.

Amy M. Tonti, Eckert, Semans, Cherin & Mellott, Pittsburgh, Pa., for Equibank.

John R. Orie, Jr., Orie & Zivic, Edward A. Olds, Pittsburgh, Pa., for Louis and Evelyn Sapp.

Anthony Barrante, Pittsburgh, Pa., for Frank Bilotta, Elizabeth Bilotta, and Gloria Veraldi.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is a *Complaint for Subordination and/or Subrogation of Liens* filed by Equibank, a judgment creditor of the above-captioned Debtor (hereinafter "Dan–Ver"). Equibank asserts that the judgments held by Frank Bilotta, Elizabeth Bilotta (Frank's wife), Gloria Veraldi (Frank's sister), Louis and Evelyn Sapp,

and R. Hardin, Inc. should be subordinated to that of Equibank, based upon § 510 of the Bankruptcy Code. Additionally, Equibank contends that the claim of R. Hardin Inc. must be subrogated, pursuant to § 509.

The parties have presented testimony and have submitted briefs on these issues. Based upon same, and this Court's further research we find in favor of Equibank, the judgment creditor, except on the Count relating to § 510(a).

### FACTS

Dan–Ver was originally incorporated in March of 1969. The initial shareholders were Attorney Robert Daniels, Elizabeth Bilotta, and Gloria Veraldi. At some point after incorporation and before 1973, each of these individuals transferred money to Dan–Ver.[1] For reasons deemed at the very least curious to this Court, it cannot be determined whether Frank Bilotta was a shareholder of the debtor-in-possession. It is clear that he has been Dan–Ver's President and Chief Executive Officer since its inception. It is also clear to the Court that conclusive proof of his status is or should be available to the Defendants; however, said Defendants have chosen not to present same at trial.

Although the incorporation documents include a "boilerplate" general purpose clause, the testimony at trial confirmed that Dan–Ver was created to purchase a specific plot of land and to erect thereon an apartment building. Said building was constructed between 1970 and 1972. In August of 1972, Community Savings Association ("Community") lent Dan–Ver $213,000.00; again, in November 1973, Community lent Dan–Ver $17,000.00. The first mortgage note was not produced at trial. The second mortgage note is signed by Frank Bilotta as President and Louis Sapp as Secretary, as well as by both men individually.

From the record evidence submitted at trial we determine as a fact that Louis Sapp became an officer of Dan–Ver in

---

1. The characterization of these funds is a critical issue, which is analyzed, *infra.*

1973. While the oral testimony offered makes it unclear as to whether he ever became a shareholder, the written evidence shows that Sapp held himself out to the public as corporate Secretary. Not only did he sign the second mortgage in that capacity, he also executed equipment leases as one of Dan–Ver's agents, and signed corporate checks. Notably, Dan–Ver's address as engraved on those checks is the same as the business address of Sapp Roofing Company, owned by Louis and Evelyn Sapp. Testimony offered to the contrary is not acceptable to the Court as credible.

Defendants' various involvements with two other corporations is also extremely important. HAP Coal, Inc. ("HAP") was incorporated to conduct strip mining operations. Frank Bilotta was a twenty-five percent (25%) shareholder. The other shareholders are not known by this Court; however, Frank Bilotta and Gloria Veraldi were corporate officers. In April of 1977, Dan–Ver's agents, Frank Bilotta and Louis Sapp, executed equipment leases with Secorp National Inc.; this equipment was then used by HAP. According to the lease, the total guaranteed payment from Dan–Ver to Secorp was $135,000.00 for the six-month rental period. The total amount paid by HAP to Dan–Ver has not been disclosed. When HAP ceased doing business, Dan–Ver terminated the equipment leases. This venture lasted less than one (1) year.

Frank Bilotta also played a major role as fifty percent (50%) owner of R. Hardin, Inc. ("R. Hardin"), which operates as a construction contractor. The original officers, as listed on the Board of Directors Resolution, which was used to open the corporate checking account, were Reuben Hardin, Frank Bilotta, and Elizabeth Bilotta. Two months later, a new Board of Directors Resolution was submitted without Reuben Hardin's name or signature. At some point Gloria Veraldi was added to the checking account signature card as an additional officer.

In August 1978, R. Hardin sought to borrow $50,000.00 from Equibank. As Equibank was unwilling to lend that sum to R. Hardin without some additional protection, Dan–Ver, through Frank Bilotta, signed a Guaranty and Suretyship Agreement.

The issues in this case surround the filing of various judgment liens against Dan–Ver, and their proper order of priority in payment:

| Judgment Holder | Note Dated | Executed By | Amount Claimed (Including Fees) | Filing Date |
|---|---|---|---|---|
| Louis and Evelyn Sapp | 05–10–73 | Frank Bilotta | $41,010.64 | 11–17–77 |
| Frank Bilotta | 03–25–77 | Frank Bilotta | $22,000.00 | 03–07–78 |
| R. Hardin, Inc. | 03–25–77 | Frank Bilotta | $15,400.00 | 03–07–78 |
| Gloria Veraldi | 03–25–77 | Frank Bilotta | $13,200.00 | 03–07–78 |
| Elizabeth Bilotta | 03–25–77 | Frank Bilotta | $10,670.00 | 03–07–78 |
| Equibank | 08–07–78 | Frank Bilotta | $57,500.00 | 09–13–78 |

The nature of these judgments is as follows:

(1) Louis Sapp testified that he loaned $30,500.00 to Dan–Ver, and the judgment note was executed by Frank Bilotta in his capacity as President of Dan–Ver; however, the verifiable evidence revealed at trial indicates that the sums in question were paid to Frank Bilotta personally and not directly to Dan–Ver.

(2) Frank Bilotta asserts that he lent Dan–Ver $20,000.00. The only documentation provided is the note itself; there are no checks or receipts verifying said loans to Dan–Ver.

(3) R. Hardin received a note from Dan–Ver for $14,000.00, allegedly arising from labor costs incurred by R. Hardin on Dan–Ver's behalf; no substantiating documentation was presented at trial.

(4) Gloria Veraldi claims that she made three (3) loans: the first was to Dan–Ver in 1971, for $13,200.00; the second was to Frank Bilotta personally in 1977, for $12,000.00; and the third was to Frank Bilotta personally in 1977, for $5,000.00. The note upon which judgment was entered, representing the $12,000.00 payment, was executed by Frank Bilotta as President of Dan–Ver.[2]

---

**2.** At trial, Gloria Veraldi testified that the signature on the Complaint in Confession of Judgment is not hers, although same was notarized.

The invalidity of the signature voids this judgment.

(5) Elizabeth Bilotta claims she lent $9,700.00 to Dan–Ver, in 1971, to allow for construction to begin on the property. No written corroboration was provided for this averment.

(6) Equibank's judgment is the result of a default, by R. Hardin, on a $50,000.00 loan, guaranteed by Dan–Ver.

(7) The schedules indicate debts owed to various unsecured creditors.

During this same time period Dan–Ver found a purchaser for the Rippey Street property. The notes of Frank Bilotta, Elizabeth Bilotta, Gloria Veraldi, and R. Hardin were then prepared, executed and filed by the insiders, in anticipation of said sale; however the parties could not agree to the appropriate distribution of the proceeds. A rift soon developed between Louis Sapp and Frank Bilotta. Because of pressures to satisfy both Sapp and Equibank, Frank Bilotta, Elizabeth Bilotta, Gloria Veraldi, and R. Hardin discussed the possibility of subordinating a portion of their interests. Neither Equibank nor Sapp could agree on specific terms; although two distribution agreements were drawn, effectively subordinating said judgments, neither was executed. The key drawback to the agreements from Sapp's point of view was that they provided for Sapp, who stood ahead in priority, to be paid on a percentage basis concurrently with Equibank.

Being unable to reach any agreement, and wishing to receive payment without continued delay, Louis and Evelyn Sapp commenced execution on their judgment and set the Rippey Street property for Sheriff's Sale. This action caused Dan–Ver to seek the protection of the Bankruptcy Court on November 1, 1979. Thereafter, on February 20, 1980, the Rippey Street property was sold free and clear of liens, with same attaching to the proceeds of said sale. The mortgages held by Community were paid; thereafter payment was made on a judgment held by Lhormer Real Estate Agency, same being filed prior to any of the other judgments presently being litigated.

The remaining available proceeds totaled $71,778.55. On January 9, 1986, this Court entered an Order requiring Dan–Ver to pay the Sapps $41,460.00 as satisfaction of their judgment. At that time we were not aware that any question existed as to their right to receive same. To the contrary; all parties in attendance at said hearing advised the Court that no dispute existed relating to Sapps' right to payment. Sapps' then-counsel, however, failed to serve Equibank with either notice of the motion for distribution or the date set for hearing; therefore, the one party who would have vigorously objected was not in attendance.

Approximately two (2) weeks later, upon routine docket examination, Equibank became aware of the acts which had transpired. It filed the instant Complaint to Enjoin the Disbursement of Funds pending resolution of the subordination issues.

## ANALYSIS

■ Equibank's first argument asserts that the written, but unexecuted distribution agreements are sufficient to cause the subordination of the claims of Frank Bilotta, Elizabeth Bilotta, Gloria Veraldi, and R. Hardin under § 510(a). Essentially Equibank's reasoning is that while a dispute existed between Louis Sapp and Equibank, causing the written agreements to remain unsigned, there was no dispute among the above-named lienholders that they intended to subordinate their claims to those of Louis Sapp and Equibank.

Section 510(a) states that:

A subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable non-bankruptcy law.

This Court does not find that an agreement was ever reached, because no "meeting of the minds" ever occurred. The documents were never executed by any of the parties, and are merely indicative of negotiations among the parties. Equibank itself was not satisfied with the terms of the agreements as drafted.

Equibank has also advanced several arguments relating to equitable subordina-

tion of the liens of Frank Bilotta, Elizabeth Bilotta, Gloria Veraldi, R. Hardin, and Louis and Evelyn Sapp. The concept of equitable subordination has long been recognized in the case law of this country. Although the Bankruptcy Act of 1898 did not include a statutory provision for subordination of claims and interests, courts did not hesitate to employ equitable subordination to provide a result which was fair and just. *Heiser v. Woodruff*, 327 U.S. 726, 66 S.Ct. 853, 90 L.Ed. 970 (1946). *See also, Matter of Powe*, 75 B.R. 387 (Bankr.M.D. Fla.1987).

The Bankruptcy Code provides statutory authority for equitable subordination at 11 U.S.C. § 510(c) which states:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution, all or part of an allowed claim or all or part of an allowed interest; or

(2) order that any lien securing such a subordinated claim be transferred to the estate.

Many of the courts which have discussed equitable subordination under this section have created and utilized a triparte test, to-wit:

(1) The claimant engages in some type of inequitable conduct;

(2) Said conduct results in injury to creditors of the debtor or confers some unfair advantage on the claimant; and

(3) Equitable subordination of the particular claim is not inconsistent with the policies stated in the Bankruptcy Code.

*In re N & D Properties, Inc.*, 799 F.2d 726 (11th Cir.1986); *In re Pacific Express, Inc.*, 69 B.R. 112 (B.A.P. 9th Cir.1986); *In re Osborne*, 42 B.R. 988 (N.D.Wis.1984); *In re Purco*, 76 B.R. 523 (Bankr.W.D.Pa. 1987); *In re Beverages International Ltd.*, 50 B.R. 273 (Bankr.D.Mass.1985); *In re UNR Industries, Inc.*, 46 B.R. 25 (Bankr.N. D.Ill.1984).

■ The essence of this test is whether the underlying activity is conducted as if it were an arm's length transaction. If it is

not, equity will set it aside. *In re McFarlin's*, 49 B.R. 550 (Bankr.W.D.N.Y.1985). However, like other forms of equitable relief, subordination is not to be invoked lightly. This Court cannot set aside a lien solely to provide a distribution to other creditors who appear to be more deserving. *In re Claxton*, 76 B.R. 539 (Bankr.E.D.Va. 1987). We can, however, subordinate the claim of an officer, director, or shareholder, who is also a creditor, to the claims of unsecured creditors, when the officer, director, or shareholder has used his insider status to conduct inequitable activities. *In re Purco, supra.*

■ Turning to the first prong of the three-part test, the courts have created three general categories of inequitable conduct warranting subordination:

1) fraud, illegality, or breach of fiduciary duty;

2) undercapitalization; and

3) use of debtor as an alter ego or instrumentality.

*Matter of Missionary Baptist Foundation of America*, 818 F.2d 1135 (5th Cir.1987); *In re Beverages International, Ltd., supra.* The law does not demand that the misconduct reach the level of moral turpitude; it need only be inequitable. *In re UNR Industries, Inc., supra.* Additionally, undercapitalization is only a basis for subordination where the claimant is a director, shareholder, or other insider. *In re N & D Properties, Inc., supra.* Therefore, if undercapitalization is asserted, it will be necessary to determine whether any of the claimants are insiders.

■ In determining whether the claimant's inequitable conduct has caused harm to other creditors or provided said claimant with an unfair advantage (satisfying the second part of the test), the Court must look to and consider the effects on creditors then-known, and also on those to be identified in the future. *In re Beverages International, Ltd., supra.*

The final part of the three-part test is whether the subordination is consistent with the other provisions of the Bankruptcy Code. One of the primary functions of

bankruptcy is to provide a fair and organized distribution of the estate assets to the creditors. If insiders have misused the Debtor, preferring themselves over others, and have created for themselves an unfair advantage, then the principles of fairness would be violated by permitting the insider to partake of the distribution in equal share with the other creditors. *In re McFarlin's, supra.*

The issues which must be determined are (1) whether any of the lienholders are insiders; and (2) whether these lienholders meet the criteria of the triparte test for equitable subordination.

Section 101(30)(B) defines an insider as:

(B) if the debtor is a corporation—

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor; ...

Section 101(30)(E) states that an "affiliate", or an insider of an affiliate is also an insider of the debtor. Section 101(2)(B) defines "affiliate" as including:

(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

(i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

(ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;

Several courts have held that the definition of insider should be applied flexibly—that those categories listed above are non-exhaustive—and that the term should include any person or entity whose relationship with the Debtor is sufficiently close that any transactions between them would be held to a closer scrutiny than those occurring at arm's length. *Matter of Missionary Baptist Foundation of America,* 712 F.2d 206 (5th Cir.1983); *In re Huizar,* 71 B.R. 826 (Bankr.W.D.Tex.1987); *In re Babcock Dairy Company of Ohio, Inc.,* 70 B.R. 657 (Bankr.N.D.Ohio 1986); *In re Benson,* 57 B.R. 226 (Bankr.N.D.Ohio 1986). Our Circuit has held that total stock control by immediate family members constitutes absolute control by a sole owner, raising the scrutiny of transactions between the stockholders and the corporation to the highest possible standard. *Matter of Trimble,* 479 F.2d 103 (3rd Cir.1973).

We address the insider status of each of the lienholders, seriatim:

(1) *Frank Bilotta*—Frank Bilotta has been the President of Dan–Ver since its inception. He has exercised exclusive control over the operation of the corporation for most, if not all, of its existence. He has executed the mortgages, leases, and judgment notes on behalf of the corporation. While no direct testimony was offered as such, the record, as a whole, makes it clear that Frank Bilotta and Dan–Ver were essentially synonymous. Therefore, we find that Frank Bilotta was and is an insider of the Debtor.

(2) *R. Hardin, Inc.*—Frank Bilotta owns at least twenty-five percent (25%) of R. Hardin and has control over the now-defunct corporation's business affairs. Frank Bilotta is also the Debtor's President and controlling person. While it has not been verified that Frank Bilotta is a shareholder, the control he exercises over Dan–Ver effectively obviates any and all control by the stockholders of record. R. Hardin is an "affiliate" of Dan–Ver and is therefore an insider of the Debtor.

(3) *HAP Coal, Inc.*—Frank Bilotta owns at least fifty percent (50%) of HAP, and has always been its controlling officer. As stated above, Frank Bilotta has without exception always controlled the Debtor, either alone or in conjunction with another

officer. HAP is an "affiliate" of Dan–Ver and therefore is an insider of the Debtor.

(4) *Elizabeth Bilotta*—Elizabeth Bilotta has been a shareholder of Dan–Ver since its inception, and has acted as an officer since 1978. As Frank Bilotta's wife, she is also a relative of the controlling officer. Additionally, she is a shareholder of R. Hardin, an affiliate/insider of Dan–Ver, and has served as an officer of same. Therefore, we find that Elizabeth Bilotta is an insider of the Debtor.

(5) *Gloria Veraldi*—Gloria Veraldi has been involved with Dan–Ver since its inception. She is the "Ver" in Dan–Ver, and was an original shareholder. She has served as an officer of R. Hardin and HAP, both affiliates/insiders of Dan–Ver. Gloria Veraldi is also a relative of Dan–Ver's controlling officer—she is Frank Bilotta's sister. Therefore we find that Gloria Veraldi is an insider.

(6) *Louis and Evelyn Sapp*—In reviewing the facts this Court finds that Louis Sapp was the Debtor's Secretary during a portion of its corporate existence, including the date on which he received a judgment note from Dan–Ver. We reject the testimony offered that he was merely acting as an insider to gain information upon which he would determine whether he should become an insider. At this stage of the proceedings such testimony is self-serving and lacks the ring of credibility. For a significant time period Louis Sapp exercised substantial control over the Debtor's operations, signing contracts, a mortgage, and equipment leases. At one point the corporate checks bore the same address as Sapp Roofing Company. While not related by blood, Louis Sapp, Frank Bilotta, and Robert Daniels all testified that "Frank and Lou were like brothers", having been very close friends since the 1950's. Based upon these findings, Louis Sapp is an insider of Dan–Ver. As Evelyn is the wife of an insider, she too, holds insider status.

The Defendants have argued that their judgments were not obtained through any inequitable conduct; rather, it is asserted that they represent loans made to the corporation, and are completely valid. The creditor challenges this position, asserting that these "loans" must be characterized as capital contributions; to classify these funds as loans forces the conclusion that Dan–Ver originally was and continued to be severely undercapitalized.

The mere fact that a claim has been reduced to judgment does not prevent this Court from questioning the validity of the underlying claim. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). In this Circuit the characterization of such claims as loans or capital contributions does not depend upon the use of the funds; rather, the test is whether the funds were advanced at a time when no commercial lender was willing to act, or whether the absence of said advances would cause the corporation to be undercapitalized. *Matter of Trimble, supra. See also, In re N & D Properties, Inc., supra.*

The burden is on the insider-claimant to show the inherent fairness and good faith of the challenged transaction. *In re Beverages International, Ltd., supra.* The insider-claimants offered little if any credible testimony or evidence to meet this burden.

There is no testimony indicating whether the Debtor sought commercial financing before purchasing the land and/or developing the apartment building. It appears that the financing which Dan–Ver did receive from Community was provided in reliance upon a completed facility ready for occupancy.

At some point prior to the purchase of the land, Gloria Veraldi advanced $13,200.00 to Dan–Ver and Elizabeth Bilotta advanced $9,700.00. Both women received stock concurrently with these advances. Based upon a Financial Statement drafted early in the corporation's existence, it is clear that without these original sums of money, Dan–Ver would have been woefully undercapitalized and completely unable to proceed with the Rippey Street project.

Creditors and shareholders assume different risks and receive different rewards. When a corporation is undercapi-

talized, a shareholder must not be permitted to call his capital contribution a loan, in order to reduce the risk of loss. *In re McFarlin's, Inc., supra.* Therefore, this Court finds that the original advances of Gloria Veraldi and Elizabeth Bilotta were capital contributions, not loans. As shareholder equity cannot be paid ahead of creditors in bankruptcy cases, we hold that same is subordinate to the claims of other creditors.

▆▆▆ Gloria Veraldi advanced two additional sums in 1977. One of the advances is represented by a note and judgment. As we stated, *supra,* Gloria Veraldi testified that the signature on the Complaint in Confession of Judgment is not hers; therefore, that judgment is null and void. However, the analysis of Gloria Veraldi's position does not end there. Several times during her testimony she stated that she made two loans—one for $12,000.00 and one for $5,000.00—both to Frank Bilotta. Although she indicated that he needed the money for his business, her testimony leads this Court to conclude that the loans were made to her brother and not the corporation. As such, these loans are not claims against the Debtor's estate at all; rather, they are debts owed by Frank Bilotta, individually. Therefore, we do not subordinate this $17,000.00 claim; rather, we disallow same in its entirety. If Gloria Veraldi has a claim, she is free to pursue same; not against this debtor-in-possession, but instead, against Frank Bilotta.

A similar result is reached in the case of Louis and Evelyn Sapp. By the credible portion of his own testimony, this Court concludes that Louis Sapp lent a total of $30,500.00 to Frank Bilotta, individually. The available documentary evidence bears this out. Although the Sapps received a note from Dan–Ver and confessed judgment against same, it is clear the parties understood that the loan was actually being made to Frank Bilotta; in fact, Louis Sapp testified that the checks evidencing said loans were made payable to Frank Bilotta. These funds may have eventually found their way to Dan–Ver, but the loan was not for that express or exclusive purpose. Therefore, this Court finds that subordination is not appropriate. Rather, the claim of the Sapps must be disallowed in its entirety; their cause of action is against Frank Bilotta, individually, not Dan–Ver. As the Sapps have already been paid by Court Order, based upon erroneous averments made to this Court, that Order will be vacated and the Sapps will be Ordered to return that sum to the estate for proper distribution.

▆▆▆ Frank Bilotta holds a judgment in the sum of $22,000.00, representing a debt of $20,000.00 and fees of $2,000.00. The Note for $20,000.00, payable to Frank Bilotta, was executed for Dan–Ver by its President, Frank Bilotta. No supporting documentation for this Note has been provided. In his deposition,[3] Frank Bilotta testified that his loans to the company included the $12,000.00 and $5,000.00 lent to him by his sister, Gloria Veraldi. He further testified that he advanced an additional $5,000.00 to Dan–Ver from a savings account in his name.[4] Frank Bilotta avers that he was never a shareholder of Dan–Ver, and that all sums advanced by him to the corporation constitute loans rather than capital contributions.

The mere fact that an officer, director, or stockholder has a claim against his bankrupt corporation or that he has reduced that claim to judgment does not mean that the bankruptcy court must accord it *pari passu* treatment with the claims of other creditors. Its disallowance or subordination may be necessitat-

---

**3.** Neither Frank Bilotta nor Elizabeth Bilotta appeared for trial, although both were subpoenaed. It was agreed that their depositions of March 4, 1986 would be admitted as their testimony.

**4.** These three figures total $22,000.00, yet the Judgment Note was executed for the sum of $20,000.00. No explanation has been offered for this discrepancy. Frank Bilotta also testified that HAP lent Dan–Ver $32,000.00. No Note was ever issued, nor was judgment ever taken. The reason for same, like many factual matters in this case, is not presently known by this Court.

ed by certain cardinal principles of equity jurisprudence.

*Pepper v. Litton,* 60 S.Ct. at 245.

Frank Bilotta is a fiduciary of the Debtor. His dealings with the corporation must be of the same arms-length standard as those between the corporation and non-insiders. In the exercise of our jurisdiction we must examine all of the circumstances surrounding this claim to see that it is fair and just. *Pepper v. Litton, supra* at 246. *See also, Twin–Lick Oil Company v. Marbury,* 91 U.S. (1 Otto) 587, 23 L.Ed. 328 (1875). In the case at bar, Frank Bilotta was the only party in a position to orchestrate the present scenario:

(1) he knew that Dan–Ver had a purchaser for the Rippey Street property, and that the purchase price would not be sufficient to pay the mortgages, the Sapps, Equibank, and the remaining insiders;

(2) as President and controlling person of Dan–Ver, he executed notes to all of the insiders;

(3) as President and controlling person of Dan–Ver, he directed Dan–Ver's counsel to prepare Complaints in Confession of Judgment and had same executed for the benefit of Frank Bilotta, Elizabeth Bilotta, Gloria Veraldi, and R. Hardin, to the detriment of then-present *and* future creditors;

(4) as 50% owner and controlling person, he knew that R. Hardin, already in dire financial straits, would likely default on its loan with Equibank;

(5) as President and controlling person of Dan–Ver, he knew that Dan–Ver, as guarantor of R. Hardin's loan from Equibank, would be called upon *to cure* the default;

(6) as President and controlling person of Dan–Ver, he directed that the above-mentioned judgments be executed prior to the execution of the guaranty to Equibank, in order to ensure that the insiders would receive a return from the anticipated sale.

Frank Bilotta cannot be permitted to use his controlling power for the advantage of a chosen few, all insiders, to the detriment of Dan–Ver's creditors; his careful orchestration of the judgment, to "dot all of the i's and cross all of the t's", satisfying all of the legalistic requirements to create valid judgment liens, based upon unsubstantiated debts, cannot be allowed. His power is limited by equity:

> ... it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the cestuis.

*Pepper v. Litton, supra* 60 S.Ct. at 247.

Frank Bilotta has engaged in conduct sufficiently inequitable to require the subordination of his judgment to that of Equibank.

Finally we turn to the judgment of R. Hardin, Inc. Factually, it is already established that R. Hardin was an affiliate/insider of Dan–Ver. R. Hardin received a judgment note from Dan–Ver in the amount of $14,000.00. The note was executed on March 25, 1977 by Frank Bilotta, as President of Dan–Ver. One year later, Frank Bilotta, as President of R. Hardin, executed the judgment against Dan–Ver.

Bilotta claims that this $14,000.00 debt arose as a result of R. Hardin's supply of paid labor to work for Dan–Ver. No documents were presented at trial in order to corroborate this claim. Based upon the same analysis previously conducted as to Frank Bilotta, the claim of R. Hardin should be equitably subordinated.

■ Even if R. Hardin could not be so equitably subordinated, its claim would be subrogated by § 509(c) which states that:

> (c) The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise.

R. Hardin and Dan–Ver are co-debtors, both liable to Equibank for the loan to R. Hardin, guaranteed by Dan–Ver, and upon

which judgment was entered by Equibank. Pursuant to § 509(c), this Court must subrogate the claim of R. Hardin to that of Equibank until Equibank is paid in full.

## CONCLUSION

In summary, this Court finds as fact and concludes in law that:

(1) Elizabeth Bilotta's contribution was a capital investment, not a loan. Her funding was part of the corporation's early equity. The classification of same as a loan, six (6) years after the fact, is inequitable, and creates an unfair advantage for her over Dan–Ver's other creditors. Classification of same as a loan would also make Dan–Ver severely undercapitalized. Her equity claim will be subordinated to all other creditors.

(2) Gloria Veraldi's initial contribution was a capital investment for Dan–Ver, part of its early equity. As an equity interest it is subordinate to all other creditors.

The additional funds put forward by Gloria Veraldi, in the sums of $12,000.00 and $5,000.00, will be disallowed as claims against this estate. By her own testimony, these sums are owed to her by Frank Bilotta, not Dan–Ver. She is free to pursue Frank Bilotta, but any claims against Dan–Ver for said funds must be disallowed.

(3) Louis and Evelyn Sapp's loans totaling $30,500.00 were to Frank Bilotta, not to Dan–Ver; therefore, the debt is owed by Frank Bilotta. The Sapps' claim will be disallowed in its entirety.

This Court's previous Order of Court, dated January 9, 1986, directing distribution to Louis and Evelyn Sapp will be vacated, with direction that said funds be returned to the estate.

(4) Frank Bilotta did not lend Dan–Ver $20,000.00; if he truly contributed anything, it was as a capital investment. His attempted transformation of an undocumented claim to a valid judgment is at the very least inequitable, and creates an unfair advantage for him over the other creditors of Dan–Ver. His claim

will be subordinated to all other creditors.

(5) R. Hardin's judgment and note are before the Court without substantiating evidence. It is clear that Frank Bilotta *was both* R. Hardin and Dan–Ver, "changing hats" when necessary. As R. Hardin cannot prove that its transactions with Dan–Ver were arm's length, the conduct is sufficiently inequitable and the advantage is clearly unfair. R. Hardin's judgment will be subordinated to all other creditors.

An appropriate Order will be issued.

## ORDER OF COURT

AND NOW at Pittsburgh in said District this 26th day of April, 1988, in accordance with the foregoing Memorandum Opinion of this same date, it is hereby ORDERED, ADJUDGED and DECREED as follows:

(1) This Court's Order of January 9, 1986, is VACATED; Louis and Evelyn Sapp are further directed to return the sum of $41,460.00 to counsel for the debtor-in-possession, Michael J. Henny, within ten (10) days of the entry of this Order;

(2) The lien of Elizabeth Bilotta is subordinated to those of all other creditors;

(3) The lien of Gloria Veraldi is null and void; further, her claim of $13,200.00 is subordinated to those of all other creditors, and her claims of $12,000.00 and $5,000.00 are disallowed as against Dan–Ver;

(4) The claim of Louis and Evelyn Sapp is disallowed as against Dan–Ver;

(5) The lien of Frank Bilotta is subordinated to those of all other creditors; and

(6) The lien of R. Hardin, Inc. is subordinated to those of all other creditors.

## ON MOTION FOR RECONSIDERATION

Presently before the Court is Louis and Evelyn Sapp's *Motion for Reconsideration* of this Court's Order 86 B.R. 443, of April 26, 1988, directing the Sapps to return the sum of $41,060.00 to this estate, and their *Motion for Stay Pending Reconsideration.*

■ The "standard for ascertaining the propriety of a stay, like that governing grants of preliminary injunctions, contains four elements: (1) a reasonable probability of success on appeal [reconsideration]; (2) the prospect of irreparable harm pendente lite if relief is not granted; (3) the possibility of harm to other interested persons; and (4) the public interest." *Gusdonovich v. Business Information Co.,* 119 F.R.D. 15, 16 (W.D.Pa.1987), and cases cited therein. The burden of proof is on the moving party. *Id.*

The Sapps have not shown a reasonable likelihood of success on their *Motion for Reconsideration.* It is unclear from the Order entered by Judge Cosetti on October 3, 1985, whether any inquiry was made as to the Sapps claim. Upon examination of said claim, it appears that the claimant is listed as Sapp Roofing Company, rather than Louis and Evelyn Sapp. Therefore, it is questionable whether the Court approved a distribution to the Sapps for a personal loan, or to the roofing company for work performed on the debtor's property; and it is debatable whether any of the parties, including the Sapps, had any explanation for the discrepancy. In any case, it is evident that the Sapp's assertion, that the October 3, 1985, Order was not challenged, is categorically incorrect.

On October 4, 1985, Judge Cosetti entered an Order giving Equibank the power to pursue its objections to Dan–Ver's proposed distribution. While that objection challenged the Sapps' claim only as to amount, and disputed the claims of other parties as to subordination, it is manifest that said investigation led to the revelation of the Sapps' insider status. The October 4, 1985 Order, entered *one day* after the Distribution Order of October 3, 1985, certainly appears to this Court to be "relief sought."

Further, this Court received oral and written testimony at the hearing on Adversary No. 86–97, and based upon same, concluded that the claim against this debtor was improper. Therefore, said claim could neither be allowed to stand, nor subordinated. The only appropriate alternative was

disallowance. *See* 11 U.S.C. § 502(b)(1). This Court's Order did not invalidate the debt owed to the Sapps—it merely transferred same to the appropriate party—Frank Bilotta, individually.

The Sapps cannot show that return of said funds to the estate would cause them irreparable harm. Said funds would be held in an interest-bearing account: if the Court determined that the Sapps were entitled to same, they would also be entitled to any accrual of interest from the date of return; if the Court finds that the Sapps are not entitled to the funds, they will not have been harmed by being required to return same. Nor is there any reason to believe that return of the funds will cause harm to any other person. On the contrary, if the funds are not returned, and this Court's Order of April 26, 1988, is upheld, the estate will be deprived of the interest accruing on said sum.

Finally, the public interest is served by the general protection of present and future creditors. Therefore, we find no cause to stay this Court's Order of April 26, 1988.

■ Similarly, the Sapps' *Motion for Reconsideration* will also be denied. The October 3, 1985, Court Order was modified on October 4, 1985, giving Equibank authority to investigate various claims against the estate, including certain claimed amounts of Louis and Evelyn Sapp. That authority obviated the Sapps' right to claim any sum under the distribution until their claim was released from investigation. The Motion by the Sapps, seeking an Order compelling distribution, was filed on October 23, 1985, *less than three (3) weeks* after the Court authorized Equibank's investigation; and yet, Equibank was not served with said Motion. A hearing notice was issued on November 22, 1985, setting the hearing on said Motion for January 9, 1986. The Sapp's did not serve notice on Equibank even though said notice was entered only six (6) weeks after the Court authorized Equibank's investigation.

■ Counsel's arguments relating to the disbursements made to Lhormer Realty and various counsel pursuant to the Octo-

ber 3, 1985 Order are unpersuasive. The October 4, 1985 Order, authorizing investigation did not apply to either of those items. Therefore, the debtor was free to make those distributions. When this Court finally authorized said distribution of January 9, 1986, we did so without notice to Equibank, the only investigatory body in this case. We are sufficiently satisfied that the Court's Order of October 3, 1985, was challenged and modified the very next day, and that the October 3, 1985 Order was final *only* to the extent it was not modified on October 4, 1985. Therefore, we find no error was committed by this Court.

At the hearing on January 9, 1986, much clamoring occurred as to the October 3, 1985 Order; however, no party saw fit to advise this Court of the modification on October 4, 1985. This Court would not have entered the January 9, 1986 Order without notice to Equibank, had we been so informed. This Court has vacated its Order of January 9, 1986 because the decision was rendered without notice to the only true objector and/or investigator in this case.

■ The Sapps also assert that this Court erred in disallowing their claim at the trial on subordination. While the trial was not specifically on the objection to the claim's allowance, the hearing did raise the issue of validity of the lien and the subordination of the claim. The credible testimony of record indicated that the debt due to the Sapps was the obligation of Frank Bilotta, not Dan–Ver.

§ 502(b)(1) of the Bankruptcy Code states:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, *except to the extent that—*

(1) *such claim is unenforceable against the debtor and property of the debtor,* under any agreement or applicable law *for a reason other than because such claim is contingent or unmatured;*

(Emphasis added).

The entire trial upon which our April 26, 1988 Order was founded, surrounded the validity and priority of substantial claims. Upon finding that the claim of the Sapps was not properly a claim against either the Debtor or property of the Debtor, this Court was obligated to disallow this claim.

This Court is not persuaded that it committed an error in its evaluation of the testimony. The only documentary evidence supplied to this Court was a check made payable to Frank Bilotta, not to Dan–Ver. No documents were provided indicating any payments to Dan–Ver. This Court heard the testimony of Louis Sapp and found same to be self-serving and less than credible. The lack of dispute between the Sapps and the other Dan–Ver insiders as to the validity of the judgment is similarly unconvincing. These parties acted in concert, perhaps even in conspiracy, to detrimentally affect the claims of the then-present and future creditors. The Motion for Reconsideration will be denied.