### In re ALL–AMERICAN AUXILIARY ASSOCIATION, Debtor.

**Bankruptcy No. 2–85–02130.**

United States Bankruptcy Court,
S.D. Ohio, E.D.

Jan. 25, 1989.

Larry E. Staats, Columbus, Ohio, trustee.

Hamilton J. Teaford, Teaford, Rich, Belskis, Coffman & Wheeler, Columbus, Ohio, for Donald E. Rice.

Robert L. Schlatter, Asst. Atty. Gen., Columbus, Ohio, for the State of Ohio.

Charles M. Caldwell, Columbus, Ohio, Asst. U.S. Trustee.

### OPINION AND ORDER ON TRUSTEE'S OBJECTION TO CLAIM NO. 7

R. GUY COLE, Jr., Bankruptcy Judge.

This matter is before the Court for decision following an evidentiary hearing on the Chapter 7 trustee's objection to the claim of Donald E. Rice. The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This matter is a core proceeding which the Court may hear and determine in accordance with 28 U.S.C. § 157(b)(1) and (2)(B). The following Opinion and Order constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule ("Rule") 7052.

#### I. *Findings of Fact*

All–American Auxiliary Association ("Debtor") filed a voluntary petition under Chapter 7 of Title 11, United States Code ("Bankruptcy Code") on July 12, 1985. The claimant, Donald E. Rice ("Rice") signed the petition in his capacity as Debtor's president. Debtor described itself in its petition and accompanying statements and schedules as a not-for-profit corporation under Ohio law, engaged in the operation of educational and competitive programs for high school cheerleaders, drill teams and similar organizations. In the six years preceding its bankruptcy filing Debtor operated under no fewer than 36 different business names. Each of these entities was apparently involved in the same or similar activities as the Debtor.

On October 3, 1985, Rice filed a proof of claim in the amount of $219,065.73 for accrued salaries, unreimbursed expenses and accounts receivable covering the years 1973 through August 1985. The Clerk of the Court has designated Rice's claim as Claim No. 7. The proof of claim is supported by attached lists of Rice's expenses

and unpaid salary, and an unidentified green ledger sheet captioned "Accrued Payable to Don Rice." These attachments were prepared by Rice for his attorney's benefit in the preparation of the proof of claim. One of the attachments, captioned "Accrued Salary Payable–Don Rice," details Rice's claim to $176,500 in unpaid salary for the years 1973 through 1984, as follows:

| Year | Salary |
|---|---|
| 1973 | $14,000 |
| 1974 | 14,000 |
| 1975 | 14,000 |
| 1976 | 14,000 |
| 1977 | 14,000 |
| 1978 | 14,000 |
| 1979 | 20,000 |
| 1980 | 20,000 |
| 1981 | 20,000 |
| 1982—$20,000 less $6,000–auto less $6,000–salary | 8,000 |
| 1983—$20,000 less $6,000 withholding | 14,000 |
| 1984 | 4,500 |
| Total | $176,500 (sic) |

Rice has deducted from his salary claim the sum of $13,452.78—an amount he characterizes simply as "personal deductions"—resulting in a total claim of $163,047.22. Because of an arithmetic or typographical error in the proof of claim, which was discovered by the Court in its post-hearing review of this matter, the pre-setoff salary claim should be reduced from $176,500 to $170,500. Rice's total claim for salary, after personal deductions, is $157,047.22 (hereinafter the "Salary Claim").

The other attachments to the proof of claim list expenses purportedly incurred by Rice on behalf of Debtor. These expenses are described by Rice as follows:

"Association Expenses:

| | |
|---|---|
| Special Expense: | |
| 1984 Hula Bowl | |
| Don Rice not reimbursed-Receipts | $ 971.00 |
| Special Expense: | |
| 1985 Hula Bowl | |
| Sharon Allread–Receipts | 1,473.00 |
| Meeting Books: | |
| Drill Team Seminars Clinic | |
| Promotion–Drill Team USA | |
| Books–Accounts Payable to Don | |
| Rice: 1143 books @ $5.72 (cost) | 6,527.96 |
| | |
| Expense Payable to Don Rice: | |
| Accrued A/P to Don Rice | $ 8,971.96 " |

However, no receipts for any of the purported expenses described above are attached to the proof of claim. Likewise, no such receipts or other evidence was adduced at the hearing in support of these claimed expenses.

Rice's proof of claim also contains camp and travel expenses purportedly incurred in 1985. These expense claims can be summarized as follows:

| | |
|---|---|
| 1985 Camp Expenses (6/1/85–7/16/85 for Mileage, Lodging and Food) | $ 1,386.60 |
| 1985 Travel Expenses (5/28/85–6/12/85) | 735.76 |
| 1985 Travel Expenses (5/20/85–5/24/85) | 759.95 |
| 1985 Travel Expenses 1/85–5/5/85) | 4,957.78 |
| Subtotal | $ 7,840.09 |
| TOTAL | $16,812.05 |

The attachments indicate that receipts are appended to the proof of claim for all the claimed travel and camp expenses ($7,840.09) except for travel expenses totaling $759.95 and $735.76. However, no such receipts are attached to the proof of claim although some receipts were made a part of the record at hearing.

In sum, Rice claims $8,971.96 for Hula Bowl and meeting book expenses, and $7,840.09 for various camp and travel-related expenses. His total claim for expenses, according to his proof of claim, is $16,812.05.

Larry E. Staats ("Staats") is the court-appointed trustee and attorney for trustee in this Chapter 7 case. Staats has filed an objection to Rice's claim, recommending the claim's disallowance *in toto* because of Rice's failure to attach sufficient documentation to support the claim's allowance as to any amount claimed by Rice. Staats also objects to the allowance of any claim for salary (or expense) for the period prior to July 11, 1978, the date on which Rice caused Debtor to be incorporated under the laws of Ohio.

The Attorney General for the State of Ohio opposes Rice's claim on similar grounds. Pursuant to his duties to protect, preserve and enforce charitable interests under state law, the Attorney General filed a complaint against Debtor, Rice and Rice's former wife in the Franklin County Court of Common Pleas, Case No. 85CV–06–3635. The complaint alleges, *inter alia*, that the defendants have breached their statutory and common law fiduciary duties in the management and operation of the Debtor, and requests an accounting of all charitable funds received by Debtor. This state court action has not yet proceeded to trial.

At the hearing Rice voluntarily withdrew his claim for unpaid salary for the period prior to July 11, 1978—the date on which Debtor was incorporated—thereby reducing his Salary Claim, by his calculation, to $87,047.22. Rice continues to assert his claim to expenses incurred in 1985, when he was appointed to serve as president, he says, by a state-court receiver for the Debtor and charged with the operation of Debtor's affairs. Although at the hearing he limited his claim to 1985 expenses, the claim inexplicably includes $971.00 in expenses purportedly incurred in connection with the 1984 Hula Bowl. Rice also asserted at the hearing a claim of $16,854—or $3,370.80 per year—for annual automobile expenses allegedly incurred between 1978 and 1982. This claim for unreimbursed annual automobile expenses is not listed in the proof of claim. Thus, Rice's claim for unreimbursed expenses (hereinafter "Expense Claim") totals $33,666.05, the sum of the $16,812.05 in expenses set forth in the proof of claim and the $16,854 in annual automobile expenses claimed by Rice at the hearing.

The facts giving rise to Rice's claim against the estate are pertinent to the Court's decision. Rice, who is currently unemployed, worked for many years as an insurance manager for a company known as American Family Life. In 1963 he became involved with high school drill teams when an all-female drill team, coached by his wife, was denied the use of a field on which to practice. While continuing his employment full-time with American Family Life, Rice became increasingly involved with high-school drill teams as well as high-school cheerleading squads and flag corps. Rice eventually organized and supervised

instructional camps and seminars for young women, many of whom later performed in parades, pageants and sporting events. Some of Rice's former students obtained scholarships to colleges and universities as a result of their skills in one or more of these activities.

Aside from its sponsorship of instructional camps and seminars, and competitive events, the record is virtually silent as to Debtor's business affairs. For example, the Court is unable to determine whether Debtor operated on a full-time basis or had full-time employees. Likewise, Rice's actual role in the affairs of the Debtor remains nebulous. Rice once claimed that he "invented" the Debtor and, as its "executive officer," set his own salary. His bankruptcy counsel's characterization of Rice's position as Debtor's "managing director" suggests his role was less commanding than once described by Rice. While Rice's characterization of his position with Debtor changes to suit his current wishes, it apprears that, until 1985, Rice served as Debtor's vice-president. In that capacity, he recruited students to attend training camps and engaged in various promotional activities, including preparation of an association magazine. Rice assumed the position of president in 1985 at or about the time the Attorney General filed his complaint against Debtor and Rice in state court. There is no evidence, however, of the amount of time Rice spent on Debtor's affairs on a daily, weekly, or monthly basis.

Prior to 1985 John Graham, a resident of Illinois, served as Debtor's president. Graham's expertise rests in judging competitive cheerleading, drill team and flag corps events. Graham also served as chairman of the major meetings held by the Debtor. His actual involvement in Debtor's business affairs was minimal, however. Graham's nominal association with the Debtor was borne out by the record and is further evidenced by the location of Debtor's "national headquarters" in Columbus along with its books, bank accounts and employees. While Rice apparently directed Debtor's daily affairs, with perhaps some periodic involvement by Graham, his former wife, Marilyn, also held a prominent role in Debtor's affairs. It appears that Marilyn Rice disassociated herself from Debtor in 1983, on or about the time she and Rice were involved in a bitterly-contested divorce proceeding. The divorce trial lasted more than a week and seemingly divided persons associated with Debtor into two camps: those loyal to Donald Rice and those loyal to his wife. Rice's preparation for the divorce trial generated many of the records upon which the parties to this contested matter rely, for it was during this period that Rice, along with his divorce counsel, reconstructed many of the Debtor's business records. No explanation was offered for the reconstruction of existing business records aside from veiled references by Rice regarding his divorce counsel's insistence that the records be "worked on" in preparation for the divorce trial and in light of the Attorney General's interest in Debtor's affairs. Because one of the primary issues in the divorce trial was whether Debtor's assets constituted "charitable property," and thus deserving of protection by the State of Ohio, or "marital property," and thus susceptible to division between the Rices, it is likely that Debtor's books were "reconstructed" by Rice and his attorney for use at the trial.[1]

There is little additional information regarding the business affairs of the Debtor. While there were vague references to a board of trustees, it is doubtful that any trustees were ever elected or appointed. Even if a board of trustees was constituted, it does not appear that it met regularly or maintained minutes or other records of its actions. There very well may have been periodic meetings between and among Gra-

---

1. At the hearing, Staats objected on *res judicata* on collateral estoppel grounds to the admission into evidence of documents indicating Rice's claim to salary or expense on the ground that the divorce court's June 5, 1985, findings of fact and conclusions of law do not find that Rice was entitled to salary or expenses from Debtor. The Court noted Staats' objection and allowed the evidence pending a ruling thereon. The Court hereby overrules Staats' objection as not well-taken.

ham, Rice and others with respect to Debtor's affairs; however, there is no probative or credible evidence—such as corporate minutes or information regarding trustees—to suggest the actual existence of any such board. Rice's testimony that trustees met regularly was not credible.

There is no probative or credible evidence supporting Rice's Salary Claim. There is no written contract regarding his employment nor any corporate action authorizing the payment of salary or reimbursement of expense. Nor is there any evidence as to the amount of time Rice spent on Debtor's affairs or the reasonable value of his services to Debtor. Rice admits that his Salary Claim rests principally on (1) his own handwritten entries in records reconstructed by unidentified persons at or around the time of his divorce, and (2) testimony that he was to be paid a salary if and when there were sufficient funds available to pay him.

## II. *Discussion*

The ability of the bankruptcy judge to rule on claims against the estate is central to the bankruptcy system. *In re Distrigas Corp.*, 75 B.R. 770, 772 (Bankr.D.Mass. 1987) (citing *Werth v. First Interstate Bank of Denver N.A. (In re Werth)*, 54 B.R. 619, 623 (D.Colo., 1985)). The district court in *Werth* noted that:

> The court may inquire into the conscionability of a claim, *In Re Elkins–Dell*, 253 F.Supp. 864, 867, 869 (E.D.Penn.1966), and it has full power to inquire into any claim asserted against the estate and to disallow it if the claim is without lawful existence. *Pepper v. Litton*, 308 U.S. 295, 305, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939).

In passing upon the validity of claims against the estate, some courts have utilized a two-step approach, analyzing claims first on legal grounds and, then, on equitable bases:

> The bankruptcy court must first determine that the claim is cognizable as a legal obligation when viewed within the context of nonbankruptcy and bankruptcy laws, and second that the effect of the allowance of the claim in the bankruptcy proceedings would be just and fair in relation to other creditors' under principles of equity jurisprudence.

*In re Beverages International, Ltd.*, 50 B.R. 273, 279 (Bankr.Mass.1985) quoting A. DeNatale and P. Abrams, *The Doctrine of Equitable Subordination as Applied to Nonmanagement Creditors*, 40 Bus.Law. 417, 419 (1985).

■ Where a claim is asserted by an insider such as Rice,[2] and where the transaction giving rise to the claim is challenged, it is well-established that the burden is on the insider-claimant to show the inherent fairness· and good faith of the challenged transaction. *See, Equibank v. Dan–Ver Enterprises, Inc. (In re Dan–Ver Enterprises, Inc.)*, 86 B.R. 443 (Bankr. W.D.Pa.1988). It is also accepted that an insider's claim may be allowed only for the reasonable value of the claim. *See*, 11 U.S.C. § 502(b)(4); *In re Tamarack Trail Co.*, 30 B.R. 99, 101 (Bankr.S.D.Ohio 1983). Where the claimant is an insider, or where the creditor exercises control over or domination of the debtor, his dealings with the debtor are subject to strict scrutiny. *Pepper v. Litton*, 308 U.S. 295, 306–07, 60 S.Ct. 238, 245–46, 84 L.Ed. 281 (1939).

Prior to examining the merit of Rice's claim, it is worth noting the relative burdens of proof between the parties. A proof of claim executed and filed in accordance with [the Bankruptcy Rules] shall constitute *prima facie* evidence of the validity and amount of the claim. Rule 3001(f). *Matter of Missionary Baptist Foundation of America, Inc.*, 712 F.2d 206 (5th Cir. 1983); *Matter of Spohn*, 61 B.R. 264 (Bankr.W.D.Wis.1986). A filing "in accordance with" the rules, in order to receive the

---

**2.** Section 101(30)(B) of the Code defines an "insider" as follows:

  (B) if the debtor is a corporation—
   (i) director of the debtor;
   (ii) officer of the debtor;
   (iii) person in control of the debtor;

   (iv) partnership in which the debtor is a general partner;
   (v) general partner of the debtor; or
   (vi) relative of a general partner, director, officer, or person in control of the debtor;
   . . . .

benefit of the claim's *prima facie* validity, means that the proof of claim must set forth the facts necessary to support the claim. *Matter of Marino*, 90 B.R. 25, 28 (Bankr.D.Conn.1988), citing 8 L. King, *Collier on Bankruptcy* ¶ 3001.05 (15th ed. 1988). In *Marino*, the proof of claim was founded upon a lease which recited that damages upon default would be determined pursuant to the schedules attached to the case. The lease was attached but did not include the schedule of damages. Because it could not calculate the damages under the lease, the bankruptcy court concluded that a valid basis for the amount claimed had not been shown. Accordingly, the court denied the claimant the presumption of *prima facie* validity, and the burden of going forward and proving its claim by a preponderance of the evidence remained on the claimant.

■ Thus, a claimant must attach all necessary supporting documents to obtain *prima facie* validity under Rule 3001(f). This is required by Rule 3001(c), which provides:

> When a claim, or an interest in property of the debtor securing the claim, is based on a writing, the original or a duplicate shall be filed with the proof of claim. If the writing has been lost or destroyed, a statement of the circumstances of the loss or destruction shall be filed with the claim.

Rice's claim does not comply with Rule 3001(c). As noted by one commentator:

> To treat a claim lacking necessary support as prima facie valid can lead to abuses of the claim process. *For instance, where an insider files a claim without the requisite support, a virtually insurmountable burden would be placed on a trustee seeking to object to the claim, since the claimant and debtor agree that the claim is valid and the trustee has no evidence available to meet his burden of proof.*

(emphasis added) 12 *Norton Bankruptcy Law Adviser* pp. 12–13 (Callaghan & Co. 1988).

■ Upon the filing of an objection to claim pursuant to Rule 3007, the objecting party must adduce facts tending to defeat the claim. *In re Multiponics, Inc.*, 622 F.2d 709, 714 (5th Cir.1980); 3 *Collier on Bankruptcy*, ¶ 502.01[3], at 502–17 (15th ed. 1987). If the objector succeeds in overcoming the *prima facie* effect of the proof of claim, then the burden remains on the creditor to prove the validity of the claim by a preponderance of the evidence. *See, In re Koontz Aviation, Inc.*, 71 B.R. 608, 610 (Bankr.D.Kansas 1987). As aptly stated by *Collier:*

> While the burden of ultimate persuasion is always on the claimant, and while probative force is given to allegations in that creditor's proof of claim, the trustee nonetheless carries the burden of going forward to meet, overcome, or at least equalize, what operates in favor of the creditor by the force of section 502(a) and the Rule.

3 *Collier on Bankruptcy*, at 502–17.

## A. *Salary Claim.*

■ In the instant case, Rice's claim is not entitled to *prima facie* validity under Rule 3001(c), (f). On that basis alone, the claim could be denied in its entirety. However, even if the Court assumes that Rice's claim is entitled to *prima facie* validity, Staats has overcome, or at least equalized, the *prima facie* effect of Rice's Salary Claim by challenging the insufficiency of the claim's documentation and other evidentiary support. Rice, who bears the burden of ultimate persuasion, has failed to convince this Court by a preponderance of the evidence that his Salary Claim is valid against this estate.

Rice's Salary Claim is supported, in part, by admittedly self-serving documentation. The supporting documentation which Rice attached to his proof of claim is of no evidentiary benefit—it consists merely of Rice's unsubstantiated and self-serving recapitulations of his claim. The other documentation—the so-called business records —also provide precious little evidentiary support. Ignoring for the moment their lack of authenticity or proper qualification as business records, the portions of the records supporting Rice's Salary Claim con-

sist of three or four-word entries at the back of each year's bookkeeping records indicating Rice's entitlement to deferred salary; *e.g.*, the 1979 bookkeeping records state "Don Rice Executive Salary—$20,-000." While the actual wording varies minimally from year to year, Rice concedes that he actually wrote the entries for each of the years in question. He believes that he made these entries, indicating his entitlement to deferred salary, in 1983 or 1984 during the divorce proceedings. The alleged original documents—characterized by Rice as "spreader sheets"—have been lost or misplaced. Rice believes as many as five girls, possibly former students, assisted him in the reconstruction of Debtor's records but he cannot now recall their names. In short, these reconstructed records, combined with the testimony of a few of Rice's former students, provide insufficient support for his Salary Claim.

Rice also claims that a board of trustees was formed, met regularly and acknowledged that he would be paid if, and when, there were sufficient funds. However, there is not one shred of credible evidence that a board of trustees was ever formed. Even if such a board existed, there is no evidence that it, or any other person with authority, authorized the payment of any salary to Rice, whether it be on a deferred, accrued or some other basis. While it is plausible that Rice periodically raised this issue in meetings with other management-level officials, there simply is no evidence supporting Debtor's obligation to pay Rice any salary. Nor is there any evidence, on this record, that Rice is entitled to the allowance of his Salary Claim in any amount under equitable considerations.

The Court is convinced that Rice, a full-time employee of American Family Life, devoted a significant amount of time and effort to the training of young women to be cheerleaders and drill team members. However, his commitment was a labor of love, so to speak, without any valid promise of remuneration. While he hoped that sufficient funds would one day be available to pay him a salary, he never believed that Debtor was legally obligated to pay him. And, even if he did somehow believe that his salary was being deferred until it could be paid, he has not shown sufficient legal or equitable support for allowance of his Salary Claim.

Rice's claim is not unlike a disputed claim before the bankruptcy court in *In re Comtec Industries, Inc.*, 91 B.R. 344 (Bankr.E.D.Pa.1988). In *Comtec*, the president of the Chapter 7 debtor filed a priority wage claim for $2,000 and an unsecured wage claim for $145,000. Finding that the claimant presented a weak case for justification of salary, the Court said:

> Here, there was not even the formality of the establishment of the Claimant's salary by any action of the Debtor's Board of Directors. No wages were carried on the Debtor's books nor was even any informal action taken until after the fact, at the time when the claims were filed, ... It was therefore only due to the grossest sort of self-serving manipulation by the Claimant himself that this claim even came into existence.

91 B.R. at 348. As in *Comtec*, Rice's claim is supported by self-serving testimony and unreliable documentation. Viewing the record as a whole, the Court finds that there is no legal or equitable basis for allowance of Rice's claim in full. Indeed, fairness requires that the Salary Claim be disallowed in its entirety.

B. *Expense Claim.*

■ Rice's Expense Claim for annual automobile expenses of $3,370.80, or a total of $16,854, suffers from the same deficiencies as his Salary Claim. The Expense Claim, like the Salary Claim, is supported by Rice's handwritten notations either underneath or beside his entries claiming deferred or accrued salary. These entries were made at the same time as the entries supporting the Salary Claim. However, there is no evidence that Rice owned an automobile or that he used an automobile on Debtor's behalf in any of the years in question except, perhaps, for the few months in 1985 for which he has gas credit card receipts. This portion of his Expense Claim, like his Salary Claim, is devoid of any support and must be disallowed.

Rice asserts that he submitted expense forms to the receiver in 1985 for expenses incurred that summer on Debtor's behalf, but that he was never reimbursed and cannot now locate the submitted forms. The documents supporting the Expense Claim consist of a few motel and fuel receipts, and a list of 1985 camp expenses prepared for his counsel's benefit. Only two of the hotel receipts make reference to Debtor. The documents attached to the proof of claim are apparently lists compiled by Rice or his attorney in connection with the preparation and filing of his claim.

The Court does not doubt that Rice contributed a considerable amount of time and effort to recruiting students and promoting Debtor's activities. It is difficult, if not impossible, however, to determine on this record whether these claimed expenses are reasonable in amount or were incurred in connection with the Debtor's affairs. Notwithstanding the virtual absence of reliable evidence, the Court will allow Rice's Expense Claim for the amounts supported by an actual invoice or receipt. Accordingly, Rice's claim for unreimbursed automobile fuel charges shall be ALLOWED in the sum of $218.34. The Court hereby disallows the expense for gas purchased in North Carolina—a state not identified as one visited by Rice on behalf of Debtor—in the amount of $19.50. The Court will also ALLOW Rice's claim in the amount of $908.65 for lodging expenses he purportedly incurred in 1985 on Debtor's behalf for which he has provided receipts. Although there was virtually no testimony regarding food expenses, the Court will ALLOW the sum of $250 for food.

There was no evidence offered to support the bulk of the Expense Claim, such as 1984 or 1985 Hula Bowl expenses, meeting or seminar book expenses, other motel and hotel expenses, or automobile expenses. While some or all of these expenses may have been incurred on behalf of the Debtor, the record made at the hearing does not support a finding, by a preponderance of the evidence or otherwise, that these other expense claims were incurred on Debtor's behalf. Nor can the Court conclude that these expense claims are legally enforceable against the estate or that their allowance would be fair.

The Court is not unmindful of Rice's assertions about original source documents. Rice claims to have delivered to his divorce attorney original spread sheets evidencing his entitlement to deferred compensation, but that either he or his attorney subsequently lost or misplaced them during preparation or conduct of the trial. However, as noted previously, there is no reliable evidence that any such original records existed or that they would have any probative value in this contested matter. Rice likewise claims that the receiver failed to reimburse him for expenses incurred in 1985 and that many of the records he placed in the custody of the receiver have been lost or simply not returned to him. Rice also has made veiled references to misdeeds committed by his divorce counsel; the receiver, a Columbus attorney; and others associated with the Debtor's affairs. However, there was no evidence of any such misdeeds or that Rice made any effort to secure the documents he claims to have delivered to his divorce attorney or receiver. Clearly Rice has not complied with Rule 3001(c) or otherwise supported his proof of claim except to the extent allowed herein.

Rice's claim is, for the most part, unsupported by reliable, probative documentation or testimony. The record, including the reconstructed, uncorroborated documents which Rice has appended to his proof of claim, supports an ALLOWANCE of the claim for unreimbursed expenses in the sum of $1,376.99 only and DISALLOWANCE for all other amounts.

IT IS SO ORDERED.