**In re SHELTER ENTERPRISES, INC., Debtor.**

**William McCHESNEY and John McChesney, t/d/b/a Chapel Gate Construction, Plaintiff,**

**v.**

**Henry J. OWOC and Joan R. Owoc, his wife, Defendants.**

**Bankruptcy No. 86–1916.
Adv. No. 88–0008.**

United States Bankruptcy Court,
W.D. Pennsylvania.

March 24, 1989.
Opinion on Reconsideration May 10, 1989.*

Gary H. Simone, Rishor & Simone, Butler, Pa., for defendants.

David J. Humphreys, Humphreys & Nubani, P.C., Pittsburgh, Pa., for defendants.

Jeffrey T. Morris, Plowman & Spiegel, Pittsburgh, Pa., for plaintiff.

J. Stevenson Suess, Butler, Pa., for debtor.

Joseph E. Schmitt, Chapter 11 Trustee, Stonecipher, Cunningham, Beard & Schmitt, Pittsburgh, Pa.

Stephen I. Goldring, Asst. U.S. Trustee, Pittsburgh, Pa.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is a Complaint by Plaintiff, an unsecured creditor (hereinafter "Chapel Gate"), requesting that the claims of Defendants, secured creditors (hereinafter the "Owocs"), be equitably subordinated to all other allowed claims against Debtor, pursuant to § 510(c) of the Bankruptcy Code. Specifically, Chapel Gate claims that the monies advanced by the Owocs to Debtor were not advanced as loans, but rather were purchases of equity interests. Chapel Gate further contends that the Defendants acted improperly and wrongfully, to the detriment of other creditors, by causing Debtor to execute judgment notes in their favor, in an effort to characterize their equity investment as debt.

Based on the pleadings, the testimony offered at trial and this Court's own research, we find that the initial advance by the Owocs of $54,000.00 does not represent a valid claim against this bankruptcy estate, and will be disallowed. The remaining advances are determined to be loans. As there was no inequitable conduct on the part of the Owocs in obtaining a judgment note to secure these loans, subordination of these claims will be denied.

## FACTS

In February or March of 1983, Henry Owoc saw an advertisement in the Business Opportunities section of The Pittsburgh Press that was placed by Debtor's principal, Frank Rolek. The text of this advertisement was not available to the Court, but according to testimony it was generally a solicitation for investors in various real estate ventures. It was not clear whether the advertisement particularly sought loans or purchases of equity interests.

Owoc responded to the advertisement and met with Rolek in March of 1983. Rolek described two projects for which he was seeking financing. One was a development of property in Cranberry Township, Pennsylvania, which was an undertaking of the Debtor, Shelter Enterprises, Inc. This corporation was formed in 1972 with fifty percent (50%), or ten (10) shares, being owned by Frank Rolek, and fifty percent (50%), or ten (10) shares, being owned by Richard Hartung. The other project involve construction of a model home under franchise which Rolek had obtained from Tri–Steel Structures. This project was known as Castle Homes, Inc. Testimony at trial revealed that Castle Homes, Inc. was never properly incorporated and was simply a fictitious name used by Frank Rolek.

On April 2, 1983, Owoc and Rolek entered into the first of what would be a number of agreements. Because this initial Agreement is significantly different from the subsequent agreements, the relevant portions of its text are reprinted verbatim:

## AGREEMENT

This AGREEMENT made this 2nd day of April 1983 between Henry J. Owoc ... and Frank J. Rolek ...

1.) ... The parties do hereby enter into an agreement for the purpose of building and selling residential housing using Frank J. Rolek's Tri–Steel Homes Dealership ...

2.) Name of Business: Castle Homes, Inc ...

5.) Capital Contributions: Capital for this AGREEMENT will be provided by Henry J. Owoc in the amount of $54,000 for 3 shares of stock of Shelter Enterprises, Inc. presently owned by Frank J. Rolek. The shares will be held by Henry J. Owoc for security ...

6.) ... A new agreement will be negotiated when Henry J. Owoc decides to become a full investor of Castle Homes, Inc....

9.) The books of Castle Homes shall at all times be available to Henry J. Owoc.

10.) All Funds for this AGREEMENT shall be deposited in interest producing funds at a S & L or Bank in the name of Castle Homes, Inc....

Accepted: /s/ _____
     Henry J. Owoc
     /s/ _____
     Frank J. Rolek

The Owocs' check for $54,000.00, made payable to Frank Rolek, accompanied this Agreement. These funds were used to construct a model home in Elizabeth Township which was titled in the name of Frank Rolek, Jr., Frank J. Rolek's son (hereinafter "Rolek, Jr."). Some eighteen (18) months after the above agreement was executed, the home was mortgaged for approximately $42,000.[1] According to the testimony of Rolek, the proceeds were used to pay bills of the Debtor.

Almost immediately after consummating the first agreement, Rolek contacted Owoc requesting additional advances. This pattern continued through early 1985, each time resulting in an advance of money by Owoc to Rolek. With the exception of a $9,000 payment on March 4, 1985, each advance was pursuant to a written instrument. Three (3) were authored by Rolek (April 4, 1983; May 19, 1983–$50,000; March 2, 1984), one (1) by Owoc (May 19, 1983–$18,000) and three (3) were boilerplate forms (February 17, 1984; November 28, 1984; June 29, 1984).

Pertinent elements of the various transactions are summarized as follows:

| Date of Agreement | Amount | Interest | Agreement Executed By | Advance Payable To | Security |
|---|---|---|---|---|---|
| 04/04/83 | $30,000 | 18% | Frank Rolek President of Shelter | Frank Rolek | 3 Shares Shelter Stock |
| 05/19/83 | 6,000 | —} | Frank Rolek | Frank Rolek | None |
| | 12,000 | 40%}[2] | Frank Rolek | Frank Rolek | None |
| 05/19/83 | 50,000 | 30% | Frank Rolek President of Shelter | Frank Rolek | 3 Shares Shelter Stock |
| 03/02/84[3] | 3,810[4] | 30%} | Frank Rolek | Cash | —— |
| | 2,000 | 30%} | President | Frank Ittel | —— |
| | 6,000 | 30%} | of Shelter | Frank Rolek | —— |
| | 3,500 | 30%} | " | Frank Rolek[5] | —— |
| | 5,000 | 30%} | " | Earl Surloff | —— |

1. No evidence of the amount of the mortgage was presented. According to the testimony of Frank Rolek it was $42,500 or $45,000.

2. In the Agreement prepared by Henry Owoc this is titled "Capital Gain".

3. The Agreement itself is undated but the text acknowledges receipt of money on this date.

4. The Agreement covers $20,000.00. The total advanced against this Agreement is $20,310.00.

5. The only evidence of this payment is a handwritten receipt signed by Frank J. Rolek, Presi-

| Date of Agreement | Amount | Interest | Agreement Executed By | Advance Payable To | Security |
|---|---|---|---|---|---|
| 02/17/84 | $10,000 [6] | — | Frank Rolek President Shelter | J.S. Martin | Judgment Note |
| 11/28/84 | 4,000 | — | Frank Rolek President of Shelter | Frank Rolek | Judgment Note |
| 03/04/85 | 9,000 | — | None | Frank Rolek} Equibank} | 6 Shares Shelter |
| 06/29/84 | 18,239 | — | None | | |

After the initial Agreement, Rolek always approached Owoc on the Debtor's behalf. The testimony showed that these latter transactions were between the Debtor and Owoc. Owoc understood that his drafts were made payable to Rolek to assure that Equibank, which held a mortgage in default on the Debtor's property, did not garnish said funds and use same as a set-off.

While the general theme of the frequent requests by Rolek was the same—if the company does not receive additional financing you may lose all that has been invested to date—it is appropriate to comment on some of the particular circumstances surrounding these transactions:

The $6,000.00 advance on May 19, 1983 was a deposit by Owoc for purchase of a townhouse. The sale was never completed.

The payments to Attorney Ittel for $2,000.00 on March 2, 1984, and to Attorney Surloff for $5,000.00 on May 26, 1984, were made to discharge obligations of the Debtor.

The payments totaling $10,000.00 to J.S. Martin, by agreement dated February 17, 1984, were to refund a deposit for the purchase of a townhouse. The sale was never completed.

On June 29, 1984, Owoc assumed a note in the amount of $18,239.09; same was the personal obligation of Richard Hartung. This debt was not guaranteed in any way by the Debtor; however, Owoc was told that covenants in the Debtor's

Equibank loan, provided that any default by the principals on their personal obligations to Equibank would trigger default on the Debtor's loan. Hartung's note was in default.

Owoc became concerned about the Debtor's financial condition, and on or about August 26, 1985, he and his attorney attended an informal work-out session of it's creditors. At that time he became aware of the full extent of Debtor's liabilities. On advice of counsel, he requested that a judgment note be executed to secure his position. This request was refused by Rolek, but was the subject of discussion over the following few months.

Finally, in December of 1985, Rolek once again approached Owoc for money. The Debtor needed $12,000.00 in order to remove Chapel Gate's lien on certain of its real property. This lien was preventing a closing between the Debtor and Ryan Homes, Inc., which would result in a $300,000.00 payment to the Debtor. Owoc refused to advance the additional money unless he received a judgment note to secure the previous advances. After further negotiation, the following compromise was reached:

(1) Owoc would return the 15 shares of the Debtor's stock, titled and owned by Rolek and Hartung, that he held as security for previous advances.

(2) Owoc would reduce his claim, not already secured by notes, from approximately $312,000.00 (including the initial $54,000.00) to $250,000.00.

(3) Owoc would advance an additional $12,000.00 to Shelter.[7]

---

dent.

6. Two (2) payments were made to J.S. Martin: $5,040.00 on 11/16/83 and $3,560.00 on 12/18/83.

7. This advance was to be included in the $250,000.00 consolidation.

(4) Shelter would execute a $250,000.00 note in favor of Owoc.

This settlement was consummated, and in January of 1986 Owoc filed his judgment note for $250,000.00 at the Butler County Courthouse. He also filed the $10,000.00 and $4,000.00 notes that he had previously received in 1984.[8] Owoc's judgment liens presently enjoy a third position on the Debtor's real property, and represent the full amount of Owoc's claim.

## ANALYSIS

Chapel Gate asserts that pursuant to § 510(c) of the Bankruptcy Code, the claims of the Owocs should be equitably subordinated to all other allowed claims against the Debtor. That section states in pertinent part:

(c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest ...

■ It was the intent of Congress to incorporate into this section the principles of equitable subordination as developed on a case-by-case basis in the courts. S.Rep. No. 95–989, 95th Cong., 2d Sess. 74 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. The principle of equitable subordination had its genesis in *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed 281 (1939), and it is with that principle that our analysis must begin.

The Bankruptcy Court will invoke its equitable powers

... to the end that fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done.

*Pepper v. Litton, Id.* at 305, 60 S.Ct. at 244. In making this analysis, the Bankruptcy Court has the power to inquire as to the "validity" of the claim and to determine that allowance of the claim would be just and fair in relation to other creditors. The fact that a claim has been reduced to judgment does not prevent the court from looking behind the judgment to determine the "nature" of the liability. *Id.* at 305, 307–308, 60 S.Ct. at 244, 245–246. To reach the issue of subordination this Court must first review the validity and the nature of the claim. If the claim itself is not valid or if the nature of the claim is that of an equity interest, then there is no need for further analysis of the Defendant's conduct.

## I. VALIDITY OF THE CLAIM

The validity of claims is governed generally by 11 U.S.C. § 502. Of particular significance to this case is § 502(b)(1), which states:

(b) Except as provided in subsections (e)(2), (f), (g), (h) and (i) of this section, if such objection to a claim is made, the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—

(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured;

While the trial was not specifically on the objection to the claim's allowance, the issue of validity was raised.

■ Although the judgment notes appear both valid on their faces and enforceable by Owoc under applicable state law, it is the duty of this Court to look behind those judgments to the validity of the underlying claims. *Pepper v. Litton, supra* at 305, 307–308, 60 S.Ct. at 244, 245–246. State substantive law determines the existence of a claim; however its allowance or disallowance is a matter of federal law and is left to the bankruptcy court's exercise of equitable powers. *In re Jones*, 72 B.R. 25 (Bankr.C.D.Cal.1987). *See also, Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156, 67 S.Ct. 237, 91 L.Ed.

---

8. See p. 228, *supra*.

162 (1946), *reh'g denied*, 329 U.S. 833, 67 S.Ct. 497, 91 L.Ed. 706 (1947); *Collier on Bankruptcy* § 502.01 (15th ed. 1986). This Court has previously exercised its equitable powers to disallow and/or subordinate claims which had been reduced to judgment. *In re Dan–Ver Enterprises, Inc.,* 86 B.R. 443 (Bankr.W.D.Pa.1988).

■ The initial Agreement between Castle Homes, Inc. and Owoc is most troublesome. Castle Homes, Inc., is a fictitious name held by Frank Rolek, and the Agreement is signed by him, individually. The funds received from Owoc were used to build a home that was never an asset of this Debtor. The only connection is the stock that was pledged as security, and the fact that proceeds of a subsequent mortgage on the property found their way to the Debtor. These connections are simply too remote.

Owoc testified that he took the shares of Debtor's stock as a way to secure the Castle Homes venture. It is clear that he did not consider this initial involvement as an advance to the Debtor. Further, the pledge of stock, which was Rolek's personal asset, is not inconsistent with our finding to dismiss this part of the claim. The fact that Rolek, Jr. subsequently took a mortgage on the property and diverted the proceeds to the Debtor, neither relieves Rolek of his obligation, nor validates a claim by Owoc against this estate.

The claim for $54,000.00 plus interest is not a valid claim against this estate but rather a claim that Owoc may pursue against Frank Rolek/Castle Homes, Inc. in an appropriate venue. All of the subsequent transactions were clearly between Owoc and the Debtor, and are valid claims against this estate.

## II. NATURE OF THE CLAIM

■ Plaintiffs argue that the language of the various agreements indicate ownership or equity interests. There is no question that the various agreements are poorly drafted, containing a mixture of words and phrases common to both equity interests and debt instruments. Much of the confusing terminology appears in the first Agree-ment. Eliminating this as applicable to this estate makes analysis much easier.

At the risk of repetition, this Court must see that substance will not give way to form. *Pepper v. Litton, supra* 308 U.S. at 305, 60 S.Ct. at 244. The uncontroverted testimony of both Rolek and Owoc was that these advances were loans. This is supported by Owoc's total ignorance of the Debtor's day-to-day affairs and its financial condition; and, by Rolek's refusal to provide this information to Owoc. Other than a few misplaced terms in the agreements that were generally offered and/or prepared by Rolek, there is no other evidence to defeat the intentions of the parties. The advances subsequent to the initial $54,-000.00 cannot be considered ownership or equity interests, as they were clearly intended to be loans.

## III. EQUITABLE SUBORDINATION

Having found that all of the advances to Shelter were loans, we now must determine if they should be subordinated to the claims of other creditors.

This Court has followed a triparte test for cases claiming equitable subordination under section 510(c):

(1) The claimant engages in some type of inequitable conduct;

(2) Said conduct results in injury to creditors of the debtor or confers some unfair advantage on the claimant; and

(3) Equitable subordination of the particular claim is not inconsistent with the policies stated in the Bankruptcy Code.

*In re Dan–Ver Enterprises, Inc., supra.*

■ In allocating the burden of proof, courts have differentiated between insiders and fiduciaries, and non-insiders and non-fiduciaries. When dealing with an insider the objecting party has the initial burden of coming forward with some substantial facts to overcome the prima facie validity of the verified proof of claim. *In re Multiponics, Inc.,* 622 F.2d 709 (5th Cir.1980); *In re Mobile Steel Co.,* 563 F.2d 692 (5th Cir.1977). Once this initial standard is met, the burden shifts to the claimant to demonstrate the good faith and fairness of the

conduct. *Pepper v. Litton, supra* 308 U.S. at 306, 60 S.Ct. at 245; *In re Mobile Steel, supra* at 701. If the claimant is not an insider or fiduciary, the burden on the moving party is greater and remains with the moving party throughout. The claimant has no burden to show that his conduct was at arm's length, unless the moving party presents material evidence of fraudulent conduct.

If the claimant is not an insider or fiduciary, however, the trustee must prove more egregious conduct such as fraud, spoilation or overreaching and prove it with particularity.

*In re N & D Properties, Inc.,* 799 F.2d 726, 731 (11th Cir.1986).

■ Section 101(30)(B) of the Bankruptcy Code defines insider as follows:

(B) if the debtor is a corporation—

(I) director of the debtor;

(II) officer of the debtor;

(III) person in control of the debtor;

(IV) partnership in which the debtor is general partner;

(V) general partner of the debtor; or

(VI) relative of a general partner, director, officer, or person in control of the debtor.

The Owocs do not fit within the definition of insider. They held no offices, nor did they exercise any control over the operations of the Debtor. According to Rolek's testimony, he sometimes told Owoc about the Debtor's problems, but never sought approval for it's activities. The only theory for classifying the Owocs as insiders would be that the agreements, by their language, represented equity or ownership interests. We have previously rejected that argument. For purposes of equitable subordination, the Plaintiffs must meet the heavier burden applicable to non-insider creditors.

When reviewing the first prong of the three part test, this court has looked to three categories of inequitable conduct warranting subordination:

(1) Fraud, illegality, or breach of fiduciary duty;

(2) Undercapitalization; and

(3) Use of debtor as an alter ego or instrumentality.

*Dan–Ver, supra* at 448.

The Plaintiffs advance the following theories for inequitable conduct on the part of the Owocs:

(1) That holding a pledge of stock equal to controlling interest constitutes sufficient control for equitable subordination.

(2) Obtaining additional collateral from a debtor in financial distress is inequitable conduct.

(3) The speculative nature of the venture and the high rate of return made it inequitable to shift the risk to the general creditors.

(4) Undercapitalization of Shelter.

■ The Plaintiffs have cited two (2) cases for the proposition that holding a pledge of stock equal to a controlling interest is grounds for equitable subordination: *In re American Lumber Co.,* 5 B.R. 470 (D.Minn.1980); and *In re Process–Manz Press Inc.,* 236 F.Supp. 333 (N.D.Ill.1964). These cases, in fact, involve much more than the pledge of stock. In both cases the creditors did hold pledges of stock, but that was only one of the factors which enabled the creditors to take control of the accounts receivable and operations of the debtor. The basis for subordination was that the complete control of the business brought the creditor within § 101(30) as an insider. At one point the Owocs did hold a pledge of stock equal to a controlling interest (15 of 20 shares), but at no time did they exercise any control over the accounts receivable or the operation of the Debtor. Holding this pledge of stock without the exercise of some control over the business is not sufficient to bring the Owocs within § 101(30) as insiders.

■ After determining that the 15 shares of stock were insufficient collateral for their advances, the Owocs sought additional security and eventually obtained a $250,000.00 judgment note. The Plaintiffs contend that obtaining additional collateral from a debtor in financial distress by means of stern measures is a factor justifying subordination. *In re American Lumber Co., supra.* Again, however, this was

but a single factor considered by the *American Lumber* court when subordinating the claim. After obtaining the additional collateral, the creditor took control of the debtor's accounts receivable and operations, using its complete dominion and control over the debtor to its own benefit. In the instant case the Owocs never exercised any such control.

The essence of the triparte test is whether the underlying activity is conducted as if it were an arm's length transaction. If it is not, equity will set it aside.

*Dan–Ver, supra* at 448.

The timing and circumstances surrounding the $250,000.00 judgment note were as follows:

(1) A meeting occurred in August of 1985, involving Plaintiff, Defendant, and Rolek, among others, at which time the full extent of the Debtor's liability was disclosed;

(2) Based on this information, the Owocs requested the note as additional security;

(3) Over the next several months, this request was repeated frequently, and each time refused by Rolek;

(4) In December of 1985, Debtor needed additional funding, and the transaction was consummated;

(5) Debtor gave the $250,000.00 judgment note to secure and consolidate the advances; and

(6) In return, Debtor received $12,000.00, return of 15 shares of its stock held as security, and reduction of the consolidated debt.

Perhaps the most significant benefit to the Debtor and its creditors in general was that the additional monies advanced would allow a closing resulting in over $300,000.00 being paid to the Debtor. The process of negotiation and the substantial benefits obtained are indicative of arm's length bargaining. This Court finds no inequitable conduct on the part of the Owocs in obtaining this additional security.

The Plaintiff's next suggest that the nature of the risk and the high rate of return make it inherently inequitable for the advances by the Owocs to be considered loans. In support of their argument they cite *In re Carolee's Combine, Inc.*, 3 B.R. 324 (Bankr.N.D.Ga.1980). In that case the Court was willing to subordinate the claims of investors despite the fact that their investments had the characteristics of loans and they exercised no control over the business. The entire capital of the debtor was provided by investors who were to receive interest, priority repayment, and a "finders fee" based on the success of the venture. The sole purpose was to conduct a single auction over two days. Despite disastrous results, each investor was paid in full on the first day of the auction. The debtor failed to pay anything to other creditors.

Several factual differences preclude our accepting *Carolee's Combine* as authority for extending subordination to the case at bar. First, the Defendants advanced money to an ongoing entity with valuable assets. Second, there were no prior arrangements for payment to be made with priority over other creditors. The Owocs received only what security they took in exchange for their advances. Third, no part of the repayment was contingent upon the success of the venture.

As for the issue of undercapitalization, this Court has clearly indicated that undercapitalization is only a basis for subordination when it is determined that the claimant is an insider. *Dan–Ver, supra*. We have previously determined that the Owocs were not insiders.

The Plaintiff's evidence of inequitable conduct does not meet the substantial burden for the first part of the triparte test. Without inequitable conduct there is no need to review the remaining two prongs and no basis for equitable subordination.

An appropriate Order will be issued.

### ORDER OF COURT

AND NOW at Pittsburgh in said District this 24th day of March, 1989, in accordance with the foregoing Memorandum Opinion of this same date, it is hereby ORDERED, ADJUDGED and DECREED that judgment is entered for Defendants.