In re CHATEAUGAY CORPORATION, Reomar, Inc., the LTV Corporation, et al., Debtors.

The LTV CORPORATION, for itself and on behalf of all affiliated debtors in these cases; the Official Committee of Unsecured Creditors of LTV Steel Company, Inc.; the Official Committee of Parent Creditors of the LTV Corporation; the Official Committee of Equity Security Holders; and the LTV Bank Group, Plaintiffs,

v.

PENSION BENEFIT GUARANTY CORPORATION, Defendant.

Bankruptcy Nos. 86 B 11270 (BRL) through 86 B 11334 (BRL), 86 B 11402 (BRL) and 86 B 11464 (BRL). Adv. No. 89–6122A.

United States Bankruptcy Court, S.D. New York.

April 4, 1991.

Davis Polk & Wardwell by Karen E. Wagner, Thomas P. Ogden, Regina E. Shannahan, Kaye, Scholer, Fierman, Hays & Handler by Michael J. Crames, Arlene R. Alves, New York City, LeBoeuf, Lamb, Leiby & MacRae by Frank Cummings, Washington, D.C., for debtors, plaintiffs.

Pension Ben. Guar. Corp. by Raymond M. Forster, Jeffrey B. Cohen, pro se.

Cleary, Gottlieb, Steen & Hamilton, by George Weisz, New York City, Skeptoe & Johnson, by John R. Labovitz, Washington, D.C., for Pension Ben. Guar. Corp.

Wachtell, Lipton, Rosen & Katz by Harold S. Novikoff, Stroock & Stroock & Lavan by Brian Cogan, Stuart M. Riback, Lawrence M. Handelsman, New York City, for LTV Steel Creditors Committee, plaintiffs.

Blank, Rome, Cominsky & McCauley by Raymond L. Shapiro, Faith R. Greenfield, Jane Flickstein, Philadelphia, Pa., for LTV Parent Creditors Committee, plaintiffs.

Warshaw Burstein Cohen Schlesinger & Kuh by Edgar H. Booth, Mary S. Zitwer, Martin R. Lee, New York City, for LTV Equity Committee, plaintiffs.

O'Melveny & Myers by Robert M. Hayes, New York City, for Counsel to LTV Bank Group.

MEMORANDUM DECISION ON THE DISCOUNT RATE TO BE USED IN CALCULATING THE ALLOWABLE AMOUNT OF A CLAIM BY THE PENSION BENEFIT GUARANTY CORPORATION

(FINDINGS OF FACT AND CONCLUSIONS OF LAW PURSUANT TO 28 U.S.C. § 157(c)(1) AND BANKRUPTCY RULE 9033)

BURTON R. LIFLAND, Chief Judge.

This adversary proceeding is before the Court pursuant to a withdrawal of the ref-

erence and referral for findings of fact and conclusions of law subject to *de novo* review in accordance with 28 U.S.C. § 157(c)(1)[1]. The instant matter deals with discrete objections to, and the allowance of, certain claims of the Pension Benefit Guaranty Corporation. This issue is distinguished from those involving the LTV pension plan terminations recently reviewed in the United States Supreme Court. *Pension Benefit Guaranty Corporation v. LTV Corporation,* — U.S. —, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990), *reversing and remanding,* 875 F.2d 1008 (2d Cir. 1989), *aff'g* 87 B.R. 779 (S.D.N.Y.1988). The dispute involves the specific discount rate to be used in calculating the value of a claim of the Pension Benefit Guaranty Corporation against the LTV Corporation and all affiliated debtors.[2] The claims of the Pension Benefit Guaranty Corporation are by far the largest group of filed claims, and their resolution will have a major impact upon the ultimate plan or plans of reorganization to be confirmed in these cases which are among the largest and most complex pending in the nation.[3] Unfortunately, determining the discount rate to be used in valuing the Pension Benefit Guaranty Corporation's claim is not an exact science, and the ultimate valuation rests upon assumptions about future events which are not ascertainable at this time.[4]

## BACKGROUND

The prior proceedings and essential facts relevant to a determination of the issue presented are not in dispute and can be summarized as follows:

On July 17, 1986 (the "Filing Date") and thereafter, the LTV Corporation ("LTV") and sixty-six of its affiliates (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Code"). Since the Filing Date, the Debtors have been continued in the management and operation of their respective businesses and properties as debtors-in-possession pursuant to §§ 1107 and 1108 of the Code. The Debtors' Chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to orders of this Court. No trustee or examiner has been appointed in any of the Debtors' Chapter 11 cases.

The Debtors are a large and highly complex group of companies principally engaged in the steel, aerospace/defense and energy products industries. LTV Steel Company, Inc. ("LTV Steel") is a major producer of hot and cold rolled sheets for the automotive and consumer durable goods markets and has been a major pro-

---

**1.** *In re Chateaugay Corp.,* 108 B.R. 27, 29 (S.D.N.Y.1989).

**2.** Only the claim relating to the Republic Salaried Plan is at issue at this time because the three other LTV Steel plans remain subject to the District Court's jurisdiction in connection with the Pension Benefit Guaranty Corporation's separate efforts to enforce restoration. *PBGC v. LTV Corp.,* 122 B.R. 863 (S.D.N.Y.1990). However, it is assumed that the economic principles discussed in these findings of fact and conclusions of law will apply, where appropriate, to all claims by the Pension Benefit Guaranty Corporation and other claimants with claims based on obligations of the LTV Corporation and all affiliated debtors to make cash payments subsequent to the date a bankruptcy petition was filed, other than those claims specifically dealt with by the Bankruptcy Code. *See,* Bankruptcy Code § 502(g).

**3.** On February 28, 1991, at a hearing to consider extending the exclusive period under Bankruptcy Code § 1121, the LTV Corporation and all affiliated debtors agreed with the Committees to file a plan of reorganization and disclosure statement pursuant to Bankruptcy Code §§ 1121 and 1125 within forty-five days, barring unforeseen developments.

**4.** "On pensions, companies go through a fantastically complicated calculation to come up with one number to put on a balance sheet or income statement. But the truth is that the amount of *the ultimate pension liability is unknown and unknowable.* How can you know how long your employees will live, or whether they will quit before retirement time, or how much medical costs will go up over the next 50 years? The one thing you do know is that single number isn't going to be accurate." Linden, *If Life Is Volatile, Account For It,* Forbes, Nov. 12, 1990, at 121 (interview with Richard C. Breeden, Chairman, Securities & Exchange Commission) (emphasis added).

ducer of high quality bar products [5]. LTV Steel is one of the largest steelmakers in the United States as a result of LTV's June 29, 1984 acquisition of Republic Steel Corporation ("Republic Steel"), and the subsequent merger of J & L Steel, a former wholly-owned subsidiary of LTV, into Republic (the surviving corporation thereafter being renamed LTV Steel).

The Pension Benefit Guaranty Corporation (the "PBGC") is a wholly-owned United States government corporation established under Section 4002 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1302, to administer the pension plan termination program created under Title IV of ERISA. 29 U.S.C. §§ 1301–1461 (1982), as amended by the Single–Employer Pension Plan Amendments Act of 1986, Pub.L. No. 99–272, 100 Stat. 237 (April 7, 1986) (codified at 29 U.S.C.A. §§ 1301–1461 (West Supp.1987)) ("SEPPAA").[6] Under ERISA, single-employer pension plans may be voluntarily terminated under certain circumstances by plan administrators under ERISA Section 4041, 29 U.S.C. § 1341. The plans may also be involuntarily terminated by the PBGC under ERISA Section 4042, 29 U.S.C. § 1342, for various reasons such as the employer's inability to adequately fund the benefit programs. The PBGC is required to guarantee payment of non-forfeitable benefits under terminated plans, subject to certain limitations. *See*, ERISA Sections 4022, 4022B, 4061, 29 U.S.C. §§ 1322, 1322b, 1361. To finance the payment of these benefits, the PBGC uses funding obtained from two sources: (1) the annual insurance premiums paid by the administrators of covered plans pursuant to Sections 4006 and 4007 of ERISA, 29 U.S.C. §§ 1306 and 1307; and (2) the employer liability payments collected under Section 4062 of ERISA, 29 U.S.C. § 1362, which make employers whose plans terminate with insufficient assets liable to the PBGC for part of the terminated plan's unfunded guaranteed benefits. *See*, 29 U.S.C. § 1362(b). When a covered pension plan terminates without sufficient funds to pay benefits guaranteed under Title IV, the PBGC takes over the assets and liabilities of the plan, makes up the deficiency in plan assets, and pays benefits to plan participants.

As of the Filing Date, the Debtors were sponsors and LTV was the administrator of a number of pension plans which provided a variety of benefits to employees and retirees. The four largest plans were those sponsored by LTV Steel. The four plans included: (1) the Jones & Laughlin Hourly Pension Plan (the "J & L Hourly Plan"); (2) the Jones & Laughlin Retirement Plan (the "J & L Salaried Plan"); (3) the Pension Plan of Republic Steel Corporation Dated and Effective as of March 1, 1950 (the "Republic Hourly Plan"); and (4) the Republic Retirement Plan (the "Republic Salaried Plan").

After the Filing Date, the PBGC decided to terminate these four plans (collectively the "Terminated Plans"). Thus, on September 30, 1986, the PBGC moved in the United States District Court for the Southern District of New York (the "District Court") to terminate the Republic Salaried Plan under the involuntary termination provisions of Title IV of ERISA. 29 U.S.C. § 1301–1461. On January 12, 1987, the PBGC moved in the District Court to terminate involuntarily the J & L Salaried Plan, the J & L Hourly Plan and the Republic Hourly Plan. As administrator of those plans, LTV consented to each of the terminations. The District Court entered the termination orders effective September 30, 1986 and January 13, 1987, respectively (collectively the "Termination Dates").

---

**5.** This Court approved Debtors' motion for the sale of its bar division in 1989.

**6.** On December 22, 1987, Congress amended Title IV of ERISA by enacting the Pension Protection Act (the "PPA") of 1987, Subtitle D of Title IX of the Omnibus Budget Reconciliation Act of 1987, Pub.L. No. 100–203, 101 Stat. 1330 (Dec.

22, 1987). Because the PPA antedated, and thus does not apply to events that give rise to this litigation, ERISA's statutory scheme as described herein does not reflect the 1987 amendments, and all citations to ERISA, as amended by SEPPAA, are to U.S.C. (Supp, 1987), except where expressly noted otherwise.

The PBGC subsequently attempted to administratively restore three of the Terminated Plans. The Debtors moved in this Court for an order declaring restoration to be in violation of § 362 of the Code. The District Court withdrew that action from this Court pursuant to the PBGC's motion under 28 U.S.C. § 157(d), and considered both matters together. *In re Chateaugay Corp.*, 86 B.R. 33 (S.D.N.Y.1987). On September 12, 1988, the District Court entered an order vacating the PBGC's Notice of Restoration, finding, *inter alia,* that the PBGC had acted in an arbitrary and capricious manner. *In re Chateaugay Corp.*, 87 B.R. 779 (S.D.N.Y.1988). On May 12, 1989, the United States Court of Appeals for the Second Circuit (the "Second Circuit") affirmed the District Court's decision. *PBGC v. LTV Corp.*, 875 F.2d 1008 (2d Cir.1989). On September 11, 1989, the PBGC filed a petition for writ of certiorari, which was granted by the United States Supreme Court on October 30, 1989. *PBGC v. LTV Corp.*, —— U.S. ——, 110 S.Ct. 321, 107 L.Ed.2d 311 (1989). In its recent decision the Supreme Court concluded:

> that the PBGC's failure to consider all potentially relevant areas of law did not render its restoration decision arbitrary and capricious. We also conclude that the PBGC's anti-follow-on policy, an asserted basis for the restoration decision, is not contrary to clear congressional intent and is based on a permissible construction of § 4047. Finally, we find the procedures employed by the PBGC to be consistent with the APA. Accordingly, the judgment of the Court of Appeals is reversed and the case is remanded for further proceedings consistent with this opinion.

*PBGC v. LTV Corp.*, —— U.S. ——, 110 S.Ct. 2668, 2681, 110 L.Ed.2d 579 (1990). The Supreme Court's restoration opinion does not directly affect the claim objection and valuation proceedings as to filed PBGC claims.

On November 24, 1987, in accordance with this Court's bar order, the PBGC filed sixty-one proofs of claim under the caption "The LTV Corporation, et al., Case No. 86–B–11272," which were deemed filed in each of the Debtors' cases.[7] Twenty-seven of the proofs of claim filed by the PBGC are based on the Terminated Plans. All Plaintiffs[8] filed objections or adoptive pleadings with respect to the PBGC claims, and pursuant to this Court's "Case Management Order" all objections and/or pleadings have been consolidated into the adversary proceeding herein (the "Adversary Proceeding").

On September 8, 1989, the PBGC moved to withdraw the reference of this Adversary Proceeding to the District Court. The PBGC's motion to withdraw the reference was assigned to Judge Duffy, who granted the PBGC's request. Judge Duffy, however, acknowledged this Court's familiarity with the parties and issues in this Adversary Proceeding and consequently referred the proceeding to this Court for findings of fact and conclusions of law under 28 U.S.C. § 157(c)(1), subject to *de novo* review by the District Court. *In re Chateaugay Corp.*, 108 B.R. at 29.

On November 21, 1989, the Plaintiffs filed their motion for partial summary judgment with respect to specified aspects of the status and priority of the PBGC claims relating to the Terminated Plans. On January 16, 1990, the PBGC crossed-moved for partial summary judgment with respect to certain issues raised by the Plaintiffs' objections and counterclaims to the PBGC's claims.

The findings of fact and conclusions of law transmitted to the District Court on May 24, 1990, dealt with issues of the status and priority of the PBGC claims. *In re Chateaugay Corp.*, 115 B.R. 760 (Bankr.S. D.N.Y.1990). Included in the findings of

---

**7.** *See,* Bankruptcy Rule 3001(f).

**8.** Pursuant to this Court's "Case Management Order", dated October 4, 1989, the following parties have been joined as plaintiffs in this Adversary Proceeding: the Debtors, the Official Committee of Unsecured Creditors of LTV Steel, the Official Committee of Equity Security Holders, the Official Committee of Parent Creditors of LTV, and the LTV Bank Group (collectively, the "Plaintiffs").

fact and conclusions of law transmitted to the District Court on the motions for partial summary judgment were the following holdings germaine to the instant discount rate issue:

Federal bankruptcy law requires that discount or interest rate assumptions used to determine the allowable amount of claims must be those realistically likely to result in the determination of the full economic value of the claim, rather than those serving other policy goals. "Once an entity has been brought into the jurisdiction of the Bankruptcy Court, it is this Court's province to determine the interest rate". *In re Caudill*, 82 B.R. 969, 978 (Bankr.S.D.Ind.1988). Clearly, "[t]he Bankruptcy Code controls the allowance of claims including those arising under ERISA." *In re Columbia Motor Express, Inc.*, 33 B.R. 389, 394 (M.D.Tenn. 1983).

\* \* \* \* \* \*

Once the value of the aggregate future liabilities has been determined, the present value of those future liabilities is determined as a matter of bankruptcy law so that all similar claims for future liabilities are treated in an economically similar manner. Thus, once it is determined that there is a valid obligation arising from non-bankruptcy law, the court will "still have to decide whether allowance of the claim would be compatible with the policy of the Bankruptcy Act". *Vanston* [*Bondholders Protective Committee v. Green*], 329 U.S. [156] at 162 [67 S.Ct. 237, 240, 91 L.Ed. 162 (1946)] (footnote omitted).

While state law ordinarily determines what claims of creditors are valid and subsisting obligations, a bankruptcy court is entitled ... to determine how and what claims are allowable for bankruptcy purposes, in order to accomplish the statutory purpose of advancing a ratable distribution of assets among the creditors.

*In re Brints Cotton Marketing, Inc.*, 737 F.2d 1338, 1341 (5th Cir.1984). *See also, In re Shelter Enterprises, Inc.*, 98 B.R. 224, 229 (Bankr.W.D.Pa.1989) (the existence of a claim is determined by state law; the allowability of the claim is determined by bankruptcy law). The determination of the allowability of a claim includes the choice of an appropriate interest rate. *See. e.g., In re Caudill*, 82 B.R. at 978. The determination of the allowability of ERISA claims is not exempted from this general rule. *See, In re Columbia Motor Express, Inc.*, 33 B.R. at 394.

*In re Chateaugay Corp.*, 115 B.R. 760, 769–770 (Bankr.S.D.N.Y.1990).

After the findings of fact and conclusions of law were transmitted to the District Court, and pending his consideration of them, Judge Duffy directed the parties to return to this Court for a determination of the specific discount rate to be applied to the claims based on the Republic Salaried Plan.

## DISCUSSION

The PBGC's employer liability claims against the Debtors as of The Plan Termination Dates are quantified by reference to "(I) the total amount of unfunded guaranteed benefits (as of the termination date) of all participants and beneficiaries under the plan...." 29 U.S.C. § 1362(b) (Supp. IV 1986). Section 1301(a)(17) defines the "amount of unfunded guaranteed benefits" of a participant or beneficiary as of any date under a single-employer plan as an amount equal to the excess of

(A) the actuarial present value (determined as of such date on the basis of assumptions prescribed by the corporation for purposes of section 1344 of this title) of the benefits of the participant or beneficiary under the plan which are guaranteed under section 1322 of this title, over

(B) the current value (as of such date) of the assets of the plan which are required to be allocated to those benefits under section 1344 of this title....

29 U.S.C. § 1301(a)(17).

Pursuant to these statutory provisions, when an underfunded plan terminates, the PBGC is charged with determining the amount of unfunded guaranteed benefits

under the plan. Under § 2619.43(a) of the Code of Federal Regulations (the "CFR"), the PBGC is also charged with determining the present value of all future plan benefits when a plan is terminated, and applies a range of discount rates for the purpose of determining termination liability, dependent on when the plan will have to pay out benefits. (PBGC Notice of Proposed Rulemaking, 41 Fed.Reg. 48, 485–86 (Nov. 3, 1976)). Although this Court has previously held that bankruptcy law controls the applicable discount rate to be used in determining the value of a claim based on the Debtors' liability for cash payments subsequent to the Filing Date, the PBGC argued that the assumptions which it used in determining the value of its claim, based upon the statutory law and regulations, do in fact result in a determination of the full economic value of the claim. Mr. Charles David Gustafson, the manager of PBGC's actuarial policy division, testified that the mortality and interest rate assumptions are directly related in these calculations. Depending on different mortality rate assumptions, Mr. Gustafson would apply a discount rate between 7.25 percent and 8.50 percent.

The PBGC also presented evidence on two alternative methodologies for ascertaining the amount of the claim. The first alternative methodology presented by the PBGC approaches the value of the claim directly, determining the value by equating the price that would have been charged by insurance companies, in a competitive bidding situation, for a nonparticipating annuity contract to meet the guaranteed benefit obligations. It should be noted that the PBGC indicated this is the same "price" which the statutory law and regulations attempt to replicate. Mr. Michael J. Mahoney, an actuary with experience in negoti-

ating annuity contracts, testified that it would have cost LTV between $223.1 million and $246.1 million to purchase the annuity contract for the Republic Salaried Plan. The range of Mr. Mahoney's most likely prices for an equivalent annuity was $229.6 million to $239.5 million.

The PBGC's second alternative approach would use the fundamental economic and financial concept of valuation which equates the present value of future cash payments with the cost of replicating the payments through a portfolio strategy of equivalent risk. Further, the PBGC argued that since future benefit payments must be considered to be certain in terms of amount and timing[9], they are risk-free in economic terms and, accordingly, the proper discount rate for determining the amount of the claim is the rate on a risk-free security, a United States Treasury Bond, of like maturity. Dr. Zvi Bodie, a professor of Finance at Boston University and a member of a task force of the Financial Accounting Standards Board (the "FASB") examining the use of present value principles in *accounting*, testified regarding the risk-free rates. Dr. Bodie testified that the internal rate of return (a proxy for the discount rate) ranged from 7.32 percent to 7.34 percent under various sets of assumptions.[10]

The Debtors presented evidence to support a contention that the appropriate discount rate is a "risk-adjusted discount rate". This discount rate is based not only on the time value of money (measured by risk-free United States Treasury Bond rates), but also the risk that LTV Steel would not meet its obligations. The evidence indicated that the "risk-adjusted discount rate" may be determined by refer-

---

**9.** The PBGC, LTV, and the Steel Committee all used the same projections of the future benefit payment stream, prepared by LTV's actuaries, Lexecon, Inc., for the purposes of this proceeding. The PBGC has indicated that it will be correcting and refining these projections based on information received and yet to be received from LTV. The final determination as to the exact amount of future cash payments has no effect on the present proceeding. For example, the PBGC's recent discovery of an apparent er-

ror in the second page of the 1982 Form 5500 sent to Lexecon, Inc., for plan year 1981 has no effect on these proposed findings of fact and conclusions of law.

**10.** On cross-examination, Dr. Bodie testified that these rates are based upon a yield curve for coupon bonds, and that if pure discount rates were calculated, they could be up to ten basis points lower or higher.

ence to the interest rates observed in the market for bonds of similar duration and priority issued by LTV Steel or Republic Steel at the same time as the pension obligations to employees arose (as opposed to the Plan Termination Dates, or the Filing Date). Dr. Richard Leftwich, a professor of Accounting and Finance at the Graduate School at the University of Chicago and an outside consultant to Lexecon, Inc., testified for the Debtors. Using various weighing assumptions, Dr. Leftwich testified that the discount rate would range between 11.8 percent and 14.5 percent. The average would be between 12.3 percent and 14.0 percent.[11] In his opinion, the blended discount rate to be used in valuing the claim is 14.3 percent.[12]

The Steel Committee's expert witness differed, and testified that the appropriate approach for determining the discount rate is based upon an analysis of "the rate of return achievable by a reasonable, prudent, long-term [pension fund] investor who seeks to achieve the best long-term return on his investment consistent with preserving his capital and minimizing risk". Mr. Carmine Grigoli, Director of Quantitative Analysis and Chief Equity Portfolio Strategist at The First Boston Corporation, testified that the discount rate under this methodology would be 11.5 percent.

In summary, this Court has been presented with five different methodologies to determine the appropriate discount rate to be used in calculating the value of a claim based on obligations of the Debtors to make cash payments subsequent to the Filing Date:

1) The rate calculated by the PBGC utilizing its interpretation of statutory law and regulations;

2) The PBGC's direct method of determining the amount of the claim by reference to the prices charged by private insurance companies for guaranteed annuity contracts;

3) The PBGC's approach utilizing present value theory, specifically, a risk-free discount rate;

4) LTV's risk-adjusted discount rate employing a company-specific risk of default, and making these calculations over the time the obligations to employees (as opposed to the PBGC) were incurred; and

5) The Steel Committee's pension fund portfolio theory using a risk-adjusted discount rate (minimizing risk with an orientation toward the future).

### I. The PBGC's Statutory Law and Regulations Approach

The PBGC's first approach is simply a restatement of the proposition that the PBGC should have the prerogative to set its own discount rate. This Court has already held that the allowance of a claim is within the province of the Bankruptcy Court, including the setting of an economically appropriate discount rate designed to assure equal treatment of all creditors. *In re Chateaugay Corp.*, 115 B.R. at 770. Therefore, even if its approach produces the "right" discount rate as the PBGC contends, it is the Bankruptcy Court, not the claiming creditor, which makes the determination as to the appropriate discount rate. Giving deference to an agency's interpretations only "sets the framework for judicial analysis; it does not displace it." *United States v. Cartwright*, 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973). *See*, Subheading II below.

### II. The PBGC's Annuity Contract Approach

The PBGC, perhaps realizing the inappropriateness of arbitrarily utilizing a claimant-controlled approach has, alternatively, recommended that the price of a private annuity contract be used as a proxy for the value of a claim that requires the Debtors to make cash payments subsequent to the Filing Date. As indicated by

---

**11.** *See,* Reply Affidavit of Richard W. Leftwich, January 21, 1991.

**12.** Based on Dr. Leftwich's post-hearing affidavit dated January 22, 1991, and premised upon

Lexecon, Inc. finding an error in its calculations, Dr. Leftwich changed the discount rate he advocated from 14.3 percent to 14.0 percent.

the PBGC's expert witnesses and expressed by counsel, the price of a private annuity contract is the standard which the statutory law and regulations attempt to replicate.

An annuity is a fixed sum payable at specified intervals for a specific period of time. A private guaranteed single premium annuity contract is a contract between a purchaser and an insurance company which guarantees the payment of specific sums at specific times in return for an initial purchase price. The issuer of the annuity is able to charge less than the total amount to be paid out because of the ability of the issuer to earn interest on the initial purchase price until the periodic payments are made (*i.e.*, an annuity priced at $450 today in return for payment of $100 per year over five years). The price of a private annuity also includes a "markup" for administrative and marketing costs, as well as an expected profit.

The PBGC relies upon the defined meaning of "actuarial present value" under generally accepted accounting principles to bolster its argument. The definition is:

> The value, as of a specified date, of an amount or series of amounts payable or receivable thereafter, with each amount adjusted to reflect (a) the time value of money (*through discounts for interest*) and (b) the probability of payment (by means of decrements for events such as death, disability, withdrawal, or retirement) between the specified date and the expected date of payment.

Statement of FASB No. 87 ("FASB 87"), Employers Accounting for Pensions, Appendix D (Glossary) (emphasis added). FASB 87, ¶ 44, also states how pension liabilities are to be discounted to present value for an ongoing plan:

> Assumed discount rates shall reflect the rates at which the pension benefits could be effectively settled. It is appropriate in estimating those rates to look to available information about rates implicit in current prices of annuity contracts that could be used to effect settlement of the obligation (*including* information about available annuity rates currently publish-

ed by the Pension Benefit Guaranty Corporation). *In making those estimates, employers may also look to rates of return on high-quality fixed-income investments currently available and expected to be available during the period to maturity of the pension benefits....*

FASB 87, ¶ 44 (emphasis added).

■ While instructive, the pronouncements of the FASB are not binding in the context of the present dispute. Even if the accounting principles were binding, they do not unequivocally support the PBGC's position on the use of private annuity contracts. Indeed, FASB 87 only suggests that private annuity rates are an appropriate, but certainly not exclusive, factor in determining a discount rate to be used for *accounting* purposes.

In addition, PBGC regulations seem to undercut its position on the appropriate discount rate to be used in determining plan insufficiency claims:

> The current value of a benefit as of a specific date is equal to the amount of money needed on that date in order to be able to pay the benefit over future years, taking into account reasonable and current expectations as to mortality, administrative expenses [both of which are important in calculating future obligations] and *interest earnings (i.e., the rate of return to be earned on the investment of the money).*

45 Fed.Reg. 38,416 (1980) (emphasis added). Therefore, although the price of private annuity contracts may have some relevance to the discount rate to be used in valuing claims for future cash payments, they are not determinative.

Even if the PBGC's annuity approach were determinative, its methodology is faulty. For example, the PBGC methodology requires information regarding annuity prices. There is no reliable source of public information on such prices. Until 1990 the PBGC's surveys of insurance companies to determine annuity prices did not even ask the companies to exclude expected profit from their quotes. In addition, the surveys do not appear to take into account volume-price reductions available in connec-

tion with the settlement of the liabilities of large pension plans.

### III. The PBGC's Risk–Free Interest Rate Approach

As a third alternative, the PBGC urges this Court to utilize economic and financial theories of valuation, specifically, the present value method of valuing future cash flows. The present value theory of valuation is based on discounting future cash flows because of both the time value of money ($100 is worth more today than in one year because of the risk of inflation and the fact that the money could be invested to yield a return for the year), and various types of risk associated with the cash flows (primarily the risk of late payment or default).

The PBGC contends that the appropriate discount rate is the risk-free rate. The interest rate on Treasury Bonds is traditionally utilized as a proxy for the risk-free rate. For example, a Treasury Bond with ten years to maturity incorporates both the lost opportunity cost (if the money were not invested in the Bonds, it could be invested elsewhere) and the effect of expected inflation over the investment period, but does not include any factor for other risks. The PBGC argues that a risk-free rate is proper since, in its view, the future benefit payments must be considered to be certain in terms of amount and timing, and are accordingly, risk-free in economic terms.

While this third theory advanced by the PBGC is an improvement over its other suggested methodologies, in that this one looks toward the future in attempting to set an appropriate discount rate, it is nonetheless insufficient because of its treatment of risk. Although the PBGC's right to its own claim based on the claims of the plan's participants may be unassailable, and therefore risk-free, its analysis begs the question. The correct question is what amount of cash (the amount of the claim)

would the PBGC have to receive (*not* the amount of the Republic Salaried Plan's obligation to the participants) to be able to pay the Debtors' future obligations as they become due. *See,* Subheading V below.

### IV. LTV's Approach

LTV contends that the discount rate used to bring the PBGC's claim to present value must reflect both the specific risk associated with the obligations of LTV Steel or its predecessor and the discount associated with any claim for nominal dollars payable over time. Further, LTV argues that:

> [t]he PBGC's claims in these cases arose as labor was performed by LTV Steel's employees, and result from its obligation to pay beneficiaries claims over time. The claims must therefore be brought to present value by reference to the risk associated with claims of similar average maturity arising when these pension claims arose.

Pretrial Memorandum, pp. 20–21.

■ LTV's contention that the claim of the PBGC must be valued as of the date the employee's claims arose is not correct, and in any event would result in an incredible, if not insoluble, accounting problem in calculating the amount of the PBGC claim. In the first instance, the claim of the PBGC is valued as of the Filing Date Code § 502(e)(2).[13] Further, LTV's proposed methodology of valuing the PBGC's claim based on when the employee's claims arose prepetition would create an unworkable system for determining the amount of the PBGC's claim.

If LTV's methodology were followed to its logical conclusion, every time (possibly every pay period) a single employee accrued pension benefits which were later assumed by the PBGC, a discount rate (determined as of the date the liability to the employee accrued) would have to be calculated to discount that single discrete

---

**13.** § 502(e)(2) A claim for reimbursement or contribution of such an entity that becomes fixed after the commencement of the case shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) of this section, the

same as if such claim had become fixed before the date of filing of the petition. *See also,* Code §§ 502(g)–(i). Except for administrative expense priority claims under Code § 503, there are no claims against an estate which are valued as of any time other than the petition date.

contingent liability. LTV attempts to circumvent this problem by using an averaging process which aggregates all employee claims on an annual basis and then uses some type of weighted average discount rate calculated, at least to some degree, on the amount of employee claims in any particular year. Even if LTV's assertions as to the proper time(s) for determining the applicable discount rate(s) were correct, their proposed methodology does not appear to yield a rate which this Court could find to be a close enough approximation of their theoretical position to warrant using the rate(s) in valuing the PBGC's claim.

In addition, LTV's assertions as to the "risk" factors to be used in calculating a discount rate are incorrect. LTV insists that the discount rate should reflect the default risk associated with LTV Steel when the claim arose, but cites no authority which is on point to bolster its argument. Instead, it relies heavily on this Court's prior decision concerning original issue discount. *In re Chateaugay Corp.*, 109 B.R. 51 (Bankr.S.D.N.Y.1990).[14] That case concerned an entirely different issue, *i.e.*, determination of the value of a claim based on a bond received in an exchange offer. This Court ruled that whatever the face amount of the bond, the value of the claim is determined by the actual value the "market" places on the bond on the date of the exchange. Additionally, the bondholder would have a claim for the amortized portion of the imputed interest (the difference between the face amount of the bond and its market value on the date of the exchange adjusted to reflect the maturity of the bond). This imputed interest reflects the discount applied by the market based upon the possibility of default given the debtor's financial characteristics, as well as the time value of money.

In contrast, the task here is to determine the amount of money needed, as of the Filing Date, to meet obligations of the Debtors to make cash payments subsequent to the Filing Date.[15] While LTV is correct in its assertion that there is a "risk" factor that has to be incorporated into the discount rate determination, the proper "risk" is not a company specific risk of default at the time the obligation arose, but rather, the "risk" associated with the possibility of defaults in an appropriate portfolio of investments which, if made on the Filing Date, would satisfy the Debtors' obligations to make cash payments subsequent to the Filing Date. *See,* Subheading V below.

## V. The Steel Committee's Portfolio Theory

The Steel Committee presented evidence that the correct approach for determining the discount rate is based upon an analysis of "the rate of return achievable by a reasonable, prudent, long-term [pension fund portfolio] investor who seeks to achieve the best long-term return on his investment consistent with preserving his capital and minimizing risk." Analysis of the Appropriate Discount Rate for Use in the Determination of the PBGC Claim, Carmine J. Grigoli (November 28, 1990) (the "Analysis"). The theoretical framework offered by the Steel Committee is grounded on the proposition that *claims for a series of cash payments in the future should be discounted to present value by a discount factor which would result in estimating the amount of cash required, as of the petition date, which when prudently invested would allow the obligations to be met as they became due.* This method is used by financial analysts every day to determine the present value of long term

---

**14.** LTV also relies upon cases involving valuation analysis in the context of plan confirmation proceedings. *See,* Debtors Pretrial Memorandum pp. 17–20. The reorganized debtor's default risk was relevant in those cases, but the debtor's pre-petition default risk was not considered in any way.

**15.** LTV's argument that a claim payable in the future should be discounted to take into account

the default risk of the Debtors, simply because the interest rate imputed in valuing a claim based on bonds issued with original issue discount includes a component for the default risk of the debtor at the time that the bond was issued, is clearly an unwarranted extension of this Court's ruling in *In re Chateaugay Corp.*, 109 B.R. at 55–56.

obligations. The methodology also satisfies the Court's prior holding that "[f]ederal bankruptcy law requires that the discount or interest rate assumptions used to determine the allowable amount of claims must be those realistically likely to result in the determination of the full economic value of the claim...." *In re Chateaugay Corp.*, 115 B.R. at 769.

The profile of a prudent investor assumes that:

1) the investor is experienced in the field of investing funds and is aware of the returns available in alternative securities;

2) the investor is aware of the risks associated with alternative investments;

3) the investor chooses to invest in a diversified portfolio to minimize risk; and

4) the investor does not actively manage the portfolio.

This hypothetical investor would choose investments which would produce a yield reflecting the returns achievable in the market as a whole. Thus, this investor would be an "average" investor earning "average" returns or, as currently referred to by the investment community, an "index fund" investor.

The prudent investor would invest in a "prudent" portfolio of diversified investments to minimize risk. This investor would not allocate 100 percent of the funds to either the stock or the bond market, but instead would allocate the funds between the two markets. The Steel Committee's expert testified that he had considered several model portfolios and chose to use the investment practices of private pension funds in creating a model portfolio. Mr. Grigoli testified that:

the pension fund is a reasonable surrogate for the prudent long-term investor because: (i) the pension fund has a fiduciary responsibility for its beneficiaries and (ii) the objectives of pension fund investors are to maximize return while preserving capital such that future obligations can be met.

The record indicates that Mr. Grigoli used the average asset allocation of private pension funds because it most accurately reflects the risk profile of the reasonable prudent investor. This asset allocation presumably reflects the best interests of beneficiaries as determined by professional investors. Mr. Grigoli looked at the mix used by administrators of private pension funds as represented by the average investment policy of $733.8 billion of pension fund assets. This led to the conclusion that 61.5 percent of funds would be invested in equities and 38.5 percent of the funds would be invested in fixed income securities including Treasury obligations, high quality, investment grade corporate securities and mortgage backed securities.

The Analysis reflects the prospective returns achievable at the end of October 1990, while incorporating the actual returns on the balanced portfolio from July 1986 through October 1990. This approach, which is applicable in this case because of the timing of the present summary judgment motion, leads to the most accurate discount rate since it accounts for what has already transpired as well as for expectations of future returns.

To determine the return a pension fund might have experienced investing in both the stock and bond market, Mr. Grigoli combined the Shearson Lehman Hutton Aggregate Bond Index (the "Shearson Index"), the benchmark for returns in the fixed income market, with the Standard & Poor 500 Index (the "S & P 500 Index"), the benchmark for returns in the equity market. The Shearson Index consists of approximately 53 percent government bonds, 18 percent investment grade corporate bonds (rated BAA or better) and 29 percent mortgage backed securities, representing the return on all U.S. fixed income securities rated BAA or better, and is widely considered to be the best indicator of returns achievable in the bond market. The S & P 500 Index is determined by aggregating each of the estimated returns for the 500 component companies, and is widely used by investment professionals as representative of a highly diversified portfolio of common stocks. Additionally, the

use of index funds minimizes transaction costs and management fees.

Mr. Grigoli calculated the actual returns for the period from July 1986 through October 1990, combined the results with the projected yields at October 1990, and found that a prudent investor who places approximately 61.5 percent of the invested funds in stocks and 38.5 percent of the invested funds in bonds would achieve a combined return of 11.5 percent.

While some of the technical specifications of Mr. Grigoli's model, as applied to the present controversy, may be open to academic dispute, the methodology applied by the Steel Committee's expert is the most rational approach to deal with the problems that inevitably arise when attempts are made to apply a theoretical model to a practical problem.

## CONCLUSION

In valuing claims for obligations of a debtor to make cash payments to a creditor at some time subsequent to the date a bankruptcy petition is filed, what is determined is how much cash would have been needed on the date of the petition, when prudently invested, to be able to satisfy the future cash obligations as they become due.

In summary, the proper methodology for valuing a claim based on an obligation of the Debtors to make cash payments subsequent to the Filing Date requires an examination of the rate of return available to a reasonable, prudent private pension fund investor who invests in a "prudent" portfolio. That investor's guiding objective is to earn the highest return on the invested capital consistent with preservation of the capital and minimization of risk. This projected rate of return should then be used to discount the Debtors' obligations to make cash payments subsequent to the Filing Date to determine the present value of the claim.

The analysis of the Steel Committee's expert produces the best approach. None of the major assumptions used in constructing that model were shown to be insupport-

able. Accordingly, the 11.5 percent discount rate produced by the Grigoli model is to be used in valuing the PBGC's claim for the obligation of the Debtors relating to the Republic Salaried Plan.

The foregoing constitutes this Court's findings of fact and conclusions of law pursuant to 28 U.S.C. § 157(c)(1) and Bankruptcy Rule 9033.